# Transcript of the Testimony of
# Sage Pina

**Date:** August 23, 2022

## Sage Pina vs. Shaman Botanicals



CRAWFORD REPORTING
(816) 507-9630
CrawfordReporting@gmail.com



PLAINTIFF'S EXHIBIT
1

Page 13

```
 1   Q.  In 2012 to 2014?
 2   A.  About that, yes.
 3   Q.  And then where did you go?
 4   A.  And then, I was actually recruited to Sephora's,
 5  which is a competitor.
 6   Q.  I know that one too.
 7   A.  And I started in Providence, Rhode Island as
 8  assistant store manager.  And then I wanted to relocate
 9  to somewhere closer to where I lived in Boston because
10  Providence was a little out of my way.  So I took a
11  voluntary step down to take a store closer to my
12  residence, but I still worked for Sephora.
13   Q.  When was that?
14   A.  That was about 2015.
15   Q.  Okay.  So you worked with -- did you work for
16  Sephora all the way until you started with Shaman in
17  2019?
18   A.  I did not.
19   Q.  Okay.  What year did you leave Sephora?
20   A.  I left Sephora, I want to say, like, 2016.
21   Q.  Okay.
22   A.  Or 2017.  Because I ended up getting recruited
23  again to work for a local owned gift shop in Boston
24  called Gifted.
25   Q.  And what years did you work for Gifted?
```

Page 14

```
 1   A.  Just a year.  Sometime in between 2016 and 2017.
 2   Q.  Okay.  And then where did you go?
 3   A.  And then I worked for a store called Savers.
 4  It's a community donation distribution center.
 5   Q.  Okay.  How long were you there?
 6   A.  I was there up until I became employed at
 7  Shaman, so until 2018.  2018 or 2019.
 8   Q.  Okay.  The Macy's you worked at, that was in
 9  Boston?
10   A.  A town called Braintree, Mass., which is a
11  suburb of Boston.
12   Q.  Can you spell that for the court reporter,
13  please?
14   A.  Of course.  Brain, B-r-a-i-n; Tree, T-r-e-e.
15   Q.  In that job, were you terminated, or did you
16  resign?
17   A.  I believe I was terminated due to attendance.
18   Q.  Could you describe the attendance-related issues
19  that led to your termination?
20   A.  Yeah.  They had a point system that didn't
21  really give any leeway to, you know, family emergencies
22  and things like that, and I just -- it ended up getting
23  me.
24   Q.  Okay.  And then from Macy's you went to Ulta?
25   A.  Correct.
```

Page 15

```
 1   Q.  And was that in Boston?
 2   A.  That was Braintree as well.
 3   Q.  Okay.  And did you resign, or were your
 4  terminated from Ulta?
 5   A.  I resigned.
 6   Q.  Okay.  And then Sephora, what town was that in?
 7   A.  Well, I started in Providence, Rhode Island and
 8  then I moved to the Braintree location.
 9   Q.  Okay.  And did you resign, or were you
10  terminated from Sephora?
11   A.  I resigned.
12   Q.  And then you went to Gifted; is that right?
13   A.  Correct.
14   Q.  You said that was in Boston?
15   A.  Yes.
16   Q.  And did you resign, or were you terminated from
17  Gifted?
18   A.  I resigned.
19   Q.  Okay.  And then lastly, you went to Savers,
20  which was also in Boston, right?
21   A.  Correct.
22   Q.  And did you resign, or were you terminated from
23  there?
24   A.  I resigned.
25   Q.  Okay.  And then you went straight from Savers to
```

Page 16

```
 1  CBD American Shaman in Boston?
 2   A.  Yes.
 3   Q.  Do you happen to remember the address of that
 4  Shaman location in Boston?
 5   A.  It was on Newbury Street.  I could be wrong, but
 6  2727 Newbury Street rings a bell.
 7   Q.  Okay.  And what was your position with CBD
 8  American Shaman in Boston?
 9   A.  I was a full-time manager.  I was never given
10  the title of store manager, but I did all of the duties.
11  I was there 95 percent of the time alone handling all of
12  the daily operations and sales.
13   Q.  Did you have a supervisor there?
14   A.  I did.
15   Q.  Who was that?
16   A.  His name is Nathan Jodat.
17   Q.  Spell that last name for the court reporter,
18  please.
19   A.  J-o-d-a-t.
20   Q.  Are you still in communication with Mr. Jodat?
21   A.  I am not.
22   Q.  Okay.  Do you recall the names of any of your
23  co-workers at CBD American Shaman in Boston?
24   A.  We had part-timer named Luke.  I don't recall
25  his last name.
```

4 (Pages 13 to 16)
Case 4:21-cv-00772-WBG   Document 36-1   Filed 11/02/22   Page 2 of 17
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

**Page 17**

1  Q. Part-time Luke, you say?
2  A. Yes. His name is Luke.
3  Q. Okay.
4  A. And then, we did briefly hire another part-timer
5  named Na Taina.
6  Q. Do you want to try to spell that for the court
7  reporter?
8  A. Yeah. It's N-a —
9  Q. Uh-huh.
10  A. — and then, T-a-i-n-a. Na Taina.
11  Q. Okay. Anyone else?
12  A. There was another girl I worked with. I feel
13  bad, I can't remember her name either. She was nice. I
14  can't recall her name.
15  Q. Are you still in communication with any of the
16  part-time co-workers from CBD American Shaman in Boston?
17  A. I am not.
18  Q. Tell me about the circumstances of you leaving
19  CBD American Shaman in Boston and coming to work for
20  American Shaman Franchise system in Kansas City.
21  A. I was really looking to grow the company however
22  I could. And I don't remember how it came across, the
23  position opening. I was on the website often, so I think
24  I might have seen it either there or -- I think maybe it
25  was on Indeed, actually.

**Page 18**

1  And it was particularly intriguing because I'm
2  from the midwest and I loved the company I worked for.
3  So I thought it would be a great opportunity for me to
4  move closer to home, while also maintaining employment at
5  the company that I loved.
6  Q. Do you remember if you submitted, like, a
7  subsequent application to go work for Shaman Franchise?
8  A. I immediately contacted -- I want to say I
9  submitted an Indeed application, and then I was going to
10  be in Kansas City for a funeral, actually. And I
11  contacted, I don't know if it was Luke, or -- I think it
12  was Luke and Joel to set up an interview.
13  You know, I said, "Hey, I work for the Boston
14  location. I'm going to be in Kansas City at this time,
15  and it would be a great opportunity for me to come and
16  meet you guys." So I capitalized my trip home by going
17  out of my way to set up a meeting for them to interview
18  me.
19  Q. Do you recall who you were interviewed by?
20  A. Yes. I was interviewed by Joel Mackey, and Luke
21  might have been in the room too. I definitely know Joel
22  was there.
23  Q. Are you referring to Luke Mancillas, I presume?
24  A. Yes.
25  Q. And I think his last name is spelled,

**Page 19**

1  M-a-n-c-i-l-l-a-s, I think.
2  A. I think so, yeah.
3  Q. And what did you understand Mr. Mancillas'
4  position to be with the company when you were
5  interviewing?
6  A. He was an HR representative.
7  Q. And what about Mr. Mackey?
8  A. He was the director of marketing.
9  Q. What was the position that you were applying
10  for?
11  A. The position was a social media coordinator.
12  Q. Prior to accepting that position with Shaman
13  Franchise, did you have any experience with social media?
14  A. Yeah. I've been in social media and did all the
15  graphic design at the Boston location, including the
16  digital printouts and things like that that we used for
17  in-store.
18  Q. Okay. Do you recall when you were offered the
19  position with Shaman Franchise?
20  A. Sometime around November 2019, I finally got the
21  offer. It was a long process. It took about three
22  months for them to make a decision, because I did have
23  certain things that I wanted, demands, I guess you could
24  say.
25  Q. Can you tell us more what your demands were?

**Page 20**

1  A. Of course. I requested a title change to a
2  creative training and development coordinator, which is
3  actually a position that I created with job duties and
4  everything, only because I knew that I would be doing a
5  lot more than just social media management. So I wanted
6  to tie that into my salary request and my title to add
7  value to my position.
8  Q. What kind of value were you trying to add?
9  A. It was -- you know, they're still in the
10  beginning stages. So I -- with all my sales experience,
11  I thought I could contribute, you know, a good sales
12  model, and just being more of a liaison for the
13  franchisees outside of just social media, but for
14  internal communications and sales training and things
15  like that.
16  Q. So you think -- I'm going to leave the screen
17  real quick, but I'll ask you this question before I go.
18  So you think you applied in August of 2019?
19  A. September, October, November. Maybe — yeah.
20  August, September, that sounds about right.
21  Q. Okay. And you said you were offered the job in
22  November of 2019?
23  A. Correct.
24  Q. Did you have any other demands besides, I guess,
25  retitling your job?

**Page 21**

A. An increase in the starting salary.
Q. Okay.
A. I did also request for relocation assistance and was denied.
Q. Do you remember what salary you requested?
A. I want to say somewhere between 45 and 50,000.
Q. Did they match your salary demands?
A. We went back and forth a couple times and we were able to, kind of, meet in a happy medium. It wasn't exactly what I wanted, but we were going to revisit after 90 days.
Q. Did you understand that when you accepted the position with Shaman Franchise that you were on a probationary period?
A. No.
Q. When you say, "revisit in 90 days," did you understand the 90 days to be associated with a probationary period?
A. Yeah. I guess more --
    THE REPORTER: I'm sorry. Can you repeat what you said?
Q. (BY MR. PORTO) Go ahead. Go ahead, Ms. Pina.
A. Yes.
Q. What was your understanding of what the terms of the probationary period were?

**Page 22**

A. Work as hard as I can to prove myself so that they would give me more money.
Q. Did you understand that at the end of the probationary period a decision might be made about whether or not you might be a good fit for the company?
A. Yeah.
Q. Do you recall the first date you started with Shaman Franchise?
A. I do.
Q. What was the date you started with Shaman Franchise?
A. I don't recall the exact date. I just remember -- I remember the day, as far as, you know, I went to -- where I went and meeting everybody and getting excited about that.
Q. Do you remember if it was within the calendar year 2020?
A. Very, very close to. Yes, it was. Yes, it was.
Q. And then you left Shaman Franchise on February 18th, 2020; is that right?
A. Correct.
Q. So your tenure for Shaman Franchise was less than 90 days; is that correct?
A. I'm under the impression the corporate location -- the store I worked for in Boston was a

**Page 23**

corporate location. So my time in Kansas City was less than 90 days, yes, but my time with the company was not.
Q. You're not alleging that you were employed by Shaman Franchise prior to January 2020; is that correct?
A. I am not sure on what "corporate location" means. But it's -- I'm under the impression that it's owned by the Franchise system and American Shaman.
Q. You're under the impression that the store you worked for in Boston was owned by American Shaman Franchise?
A. Yeah. It was considered a corporate location.
Q. Well, you're familiar with, kind of, the general landscape of American Shaman, it sounds like. So you understand there's a difference between stores that are owned by the corporation themselves, and then stores that are owned by franchises, right?
A. Correct.
Q. And the store you worked for in Boston was not owned by a franchise, right?
A. It wasn't owned by Nathan Jodat.
Q. Okay.
A. He was considered the store manager, and he always expressed to me it was a corporate location. And even when I got to the Franchise System, I was able to see which stores were corporate locations, and Boston was

**Page 24**

always in that column, along with the others.
Q. Do you remember the name of the entity that issued your paychecks when you were in Boston?
A. I can't recall.
Q. Was it CBD American Shaman?
A. I can't recall.
Q. Do you remember, when you started for Shaman Franchise in January 2020, if the entity that paid your paychecks was a different entity?
A. I can't recall. I got paperless, so I never looked at actual checks.
Q. Okay. You stated earlier that you understood that when you started with Shaman Franchise in January of 2020, you were under a 90-day probationary period, right?
A. In terms of my potential raise, whether I would get a raise or not.
Q. You also testified earlier that at the end of your probationary period, there might be a decision made whether or not you were a good fit for the company. Do you remember testifying to that a few minutes ago?
A. Yes.
Q. So it had more to do than just your raise, didn't it?
A. Can you repeat that?
Q. The probationary period had more to do than just

6 (Pages 21 to 24)
Case 4:21-cv-00772-WBG   Document 36-1   Filed 11/02/22   Page 4 of 17
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

**Page 25**

1 whether or not you were entitled to a raise. You were a
2 probationary employee, at which point a decision might be
3 made about whether or not you were a good fit for the
4 company, correct?
5   A. Correct.
6   Q. Do you recall signing an employment handbook
7 when you started at Shaman Franchise?
8   A. Yes.
9   Q. Would you agree with me that the parties to that
10 handbook are yourself and American Shaman Franchise
11 System, Inc.?
12  A. Sorry?
13  Q. Would you agree with me the parties to that
14 employment handbook are yourself and American Shaman
15 Franchise, Inc.?
16  **A. I'm under the impression that it would be all**
17 **Shaman entities. I wasn't aware that there was a**
18 **different handbook for the different separate locations.**
19  Q. Okay. Let's see. You're going to push my
20 technical capabilities here to share a screen in Zoom.
21 Everyone bear with me.
22       MR. PORTO: Shaun, did that work?
23       MR. STALLWORTH: It did.
24       MR. PORTO: You're not looking -- like, a
25 picture of my bank account or something like that?

**Page 26**

1 You're looking at --
2       MR. STALLWORTH: No, no, no. You know,
3 I'd be taking screenshots right now on my phone, and my
4 hands are in the picture, you know, so.
5       (Exhibit 1 was marked for identification.)
6   Q. (BY MR. PORTO) All right. Ms. Pina, I'm going
7 to hand you what we'll mark as Exhibit 1. Do you see
8 that there in your screen?
9   A. I do.
10  Q. I'm going to scroll down here with you. Maybe
11 I'll scroll up first then I'll scroll down.
12     So this is a document that's entitled,
13 Employment Handbook January 2019. Do you see that there?
14  A. Yes.
15  Q. Okay. I'm going to scroll to the bottom -- I'll
16 just, kind of, scroll through this. You don't have a
17 copy of this there with you, do you, Ms. Pina?
18  **A. I do not. But I do have -- I have it somewhere**
19 **in my e-mails.**
20  Q. This is a document that we produced in this
21 lawsuit. I'm just going to scroll through here to the
22 end. I'm almost there. Hang on. Is that your signature
23 on the page marked DEF0035?
24  A. Yes.
25  Q. And it appears you signed this on January 2nd,

**Page 27**

1 2020?
2   A. Yes.
3   Q. And then, you see here in the Acknowledgment
4 Form, if you just look at the top, it references American
5 Shaman Franchise System, Inc. Do you see that there?
6   A. I do.
7   Q. Is that who you understood you were employed by
8 in January of 2020?
9   **A. Yes. But I was asked to sign it at the American**
10 **Franchise warehouse location by Luke, who is not employed**
11 **by American Franchise System, Inc., to my knowledge.**
12  Q. Okay. And if you go to the top of the handbook,
13 first page under, Welcome, says "Congratulations on
14 becoming a part of the American Shaman Franchise System
15 team."
16  A. Yes.
17  Q. Same question. You understand that you were
18 employed by American Shaman Franchise System?
19  **A. I did, but I was given it at the other location**
20 **by an employee --**
21  Q. Okay.
22  **A. -- not employed by American Shaman Franchise**
23 **Systems, Inc. So to my knowledge they were one entity.**
24  Q. You've added Shaman Botanicals, LLC as a party
25 to this lawsuit; is that correct?

**Page 28**

1   A. Yes.
2   Q. Do you believe you were ever employed by Shaman
3 Botanicals, LLC?
4   A. Yes.
5   Q. How do you believe that you were employed by
6 Shaman Botanicals, LLC?
7   **A. I spent a lot of my days while I was employed**
8 **for them going back and forth between both locations,**
9 **being involved in meetings with employees from the**
10 **other -- the ware- -- the warehouse we'll call it, to**
11 **create a bridge of communication between the two.**
12 **Therefore, I, a hundred percent, felt like I was a part**
13 **of that team as well.**
14  Q. I don't deny -- I mean, you're stating there was
15 some interaction between American Shaman Franchise System
16 and Shaman Botanicals, and I don't -- I don't deny that.
17 Is that what you're suggesting?
18  A. Yes.
19  Q. But you never -- you never filled out an
20 employment application with Shaman Botanicals, LLC, as
21 far as you recall?
22  **A. I had an interview with the director of**
23 **marketing.**
24  Q. That wasn't my question. Did you ever fill out
25 an employment application with Shaman Botanicals, LLC?

7 (Pages 25 to 28)
Case 4:21-cv-00772-WBG   Document 36-1   Filed 11/02/22   Page 5 of 17
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

**Page 29**

A. Not that I recall. And I don't recall filling out an actual employment application for the Franchise Systems either.

Q. Well, you said you applied through Indeed, right?

A. Okay. I guess that technically is, yeah.

Q. You never received any compensation from Shaman Botanicals, LLC?

A. Not that I can recall.

Q. Okay. When you're -- and you stated earlier that you were previously employed by CBD American Shaman, which is a third entity in Boston. CBD American Shaman is not a party to this lawsuit; is that correct?

A. Can you repeat that? I'm sorry.

Q. You stated earlier that you were previously employed by CBD American Shaman in Boston, right?

A. Correct.

Q. The only two parties to the lawsuit you filed are Shaman Botanicals, LLC and American Shaman Franchise Systems, Inc.; is that correct?

A. Correct.

Q. You've not added an entity called CBD American Shaman to this lawsuit; is that correct?

A. Correct. I would assume that the Boston location being a corporate location, being owned by

**Page 30**

American Franchise Systems, Inc., would include that in the American Franchise System, Inc.

Q. You don't -- I mean, just to be clear. You don't know who owns the Boston location, correct? Have you ever seen any ownership documents suggesting who owns that store?

A. I am going off of the system, the computer system, that we used to, kind of, knock out the stores, where that one was in the column that was with all of the other corporate locations. Boston was considered a corporate location as far as our software went when describing stores.

Q. You're not alleging that you were discriminated against when you were working in Boston? That's my question.

A. Correct.

Q. Okay. You're not alleging any bad acts, discriminatory behavior, retaliatory behavior happened to your prior to 2020 when you were employed in Boston; is that right?

A. Correct.

Q. Okay. And you have never seen any corporate paperwork identifying who owns the Boston location; is that correct?

A. Not a person, but the American Franchise

**Page 31**

Systems, Inc. I was under the impression owned it based on the system that said it did when it would separate franchisees and corporate locations.

Q. Are you denying that your employers changed when you moved from Boston to Kansas City in 2020?

  MR. STALLWORTH: Objection. Vague. You can answer if you understand it.

A. I don't understand.

Q. (BY MR. PORTO) Do you understand that your employers changed when you moved from Boston to Kansas City?

A. Could you repeat the question?

Q. Do you understand that your employers changed when you moved from Boston to Kansas City in 2020?

A. I don't know.

Q. Why would you fill out a new application if your employers didn't change?

A. Because it was an elevated position in a different location.

Q. Did you fill out any other new hire-type paperwork? Do you remember doing any of that?

A. Maybe when I signed the handbook, you know, the updated emergency lists and things like that.

Q. Why would you have been placed on a 90-day probationary period if your employer did not change?

**Page 32**

A. I don't know.

Q. Tell me more about your demands for relocation expenses.

A. I just asked them, you know, if they might be generous enough to help with my relocating halfway across the country, you know, moving my entire life halfway across the country alone without, you know, a savings where I could afford a place.

Q. Who did you ask that to?

A. There was an e-mail thread that I want to say was going between Luke, Joel and Marc Sayler and myself in regards to all of these.

Q. Do you still have a copy of that e-mail thread?

A. I do.

Q. Okay. And what did you ask for?

A. I can't recall the exact number, but it was just something in the form of money to help me relocate my lifestyle from Boston to Kansas City.

Q. Did you ever receive any kind of remuneration for your moving expenses?

A. Sorry. Repeat that.

Q. Did you ever receive any kind of remuneration for your moving expenses?

A. I did not.

Q. You testified earlier that before you left

8 (Pages 29 to 32)
Case 4:21-cv-00772-WBG   Document 36-1   Filed 11/02/22   Page 6 of 17
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

**Page 37**

1  Mr. Zicarelli?
2  A. No.
3  Q. You understand you filed a lawsuit against
4  Shaman Botanicals and American Shaman Franchise System,
5  Inc.?
6  A. Yes.
7  Q. And in your lawsuit you are alleging that you
8  were discriminated and retaliated against by those two
9  entities; is that correct?
10 A. Yes.
11 Q. Can you tell me, in your own words, why you
12 believe that you were discriminated against or retaliated
13 against?
14 A. I brought to HR's attention instances of
15 employees being racially discriminated against, and I
16 felt my -- I felt they were very dismissive to those
17 complaints.
18     During my time there, I witnessed other white
19 employees breaking the rules without consequence,
20 individuals breaching the company handbook and not being
21 retaliated against or treated like I was.
22 Q. It appears to me that you started with Shaman
23 Franchise on January 2nd, 2020, that's the date you
24 signed the handbook, and you left Shaman Franchise on
25 February the 18th; is that correct?

**Page 38**

1  A. Yes.
2  Q. So you were there for about, give or take, 46
3  days. Does that sound about right?
4  A. Yes.
5  Q. You testified earlier that in that 46-day
6  period, you made various complaints regarding, I guess,
7  the treatment of other co-workers; is that right?
8  A. Correct.
9  Q. If you could, I would like to go through these
10 complaints with you and understand a little bit more
11 about each of them. Okay?
12 A. Okay.
13 Q. Tell me the circumstances regarding the first
14 complaint you made.
15 A. I believe it was -- I could get them all mixed
16 up. It's been a long time. But Thomas Miles told me he
17 was being racially discriminated against and he didn't
18 feel safe going and making formal complaints. Now I
19 realize it's because Missouri is an at-will employer and
20 he was afraid of maybe losing his job.
21     But because I was -- I was going over to the
22 warehouse very often where HR is housed, I made it a
23 point to bring it up to Luke about Thomas's complaints.
24 He said he was getting, you know, racist memes sent to
25 him from his direct supervisor that made him feel

**Page 39**

1  uncomfortable. And so that was one.
2  Q. So let's stop there for a second.
3  A. Okay.
4  Q. Who did you make this complaint to?
5  A. Luke, the HR representative.
6  Q. Okay. And was that complaint made in an e-mail
7  or in person?
8  A. It was in person.
9  Q. In Paragraph 17 of your complaint, you say
10 Mr. Mancillas acknowledged this complaint, but did not
11 indicate any further action; is that correct?
12 A. Correct.
13 Q. Is it possible that this complaint could have
14 been investigated and you didn't know about it?
15 A. I don't know.
16 Q. You don't know everything that happens in a
17 company, right?
18 A. He basically told me that they weren't doing
19 anything about it. So I just knew -- I knew based on
20 what he was telling me.
21 Q. When did Mr. Mancillas tell you that?
22 A. He just always, kind of, said -- like, "I'm
23 trying." Like, "I'm" -- you know. He always seemed very
24 much on my side and sympathized with me that more action
25 could be taken and it wasn't being taken. So not those

**Page 40**

1  words exactly, but --
2  Q. Is it possible that Mr. Miles' complaint was
3  investigated without your knowledge?
4  A. I don't know.
5  Q. You don't know if it's possible?
6  A. I suppose it's possible.
7  Q. Okay. We'll call that complaint No. 1, is
8  Thomas Miles. Was there any other complaints that you
9  recall?
10 A. Juanita Thedford felt like she was being
11 racially discriminated against in regards to her pay due
12 to her duties. Abraham Torres felt like --
13 Q. Hold on. Before you move to Mr. Torres, let's
14 talk more about --
15 A. Uh-huh.
16 Q. -- Ms. Thedford. What was the nature of
17 Ms. Thedford's complaints.
18 A. She -- hers were pay wage discrimination due to
19 her race.
20 Q. Okay.
21 A. I'm unsure what happened on that.
22 Q. Hold on. You're kind of getting whompy there.
23 A. Sorry.
24 Q. Say that again.
25 A. It was a pay wage discrimination due to

**Page 41**

1  racial -- due to her race, and I'm unsure what brought
2  her to that, if it was, you know, she saw somebody else,
3  what they were making in comparison to her pay rate.
4     Q.  What was Ms. Thedford's position?
5     A.  She was -- I don't know --
6     Q.  I have some feedback, and I don't know if my
7  question came through.
8        My question was, what was Ms. Thedford's
9  position with the company?
10    A.  I can't recall the exact title, but it seems
11 like she did graphic design, things of that nature.
12    Q.  Do you know if she was paid on a commission or a
13 salary?
14    A.  I do not.
15    Q.  What about Mr. Torres -- or excuse me,
16 Mr. Miles, what was his position with the company?
17    A.  He was a business representative, I want to say.
18 He helped, like, the franchisees, like the future
19 franchisees find locations and build out their stores and
20 get them settled with their new locations.
21    Q.  Do you know if he was paid a commission or a
22 salary?
23    A.  That I am unsure of.
24    Q.  Okay.  You were then testifying about what we'll
25 call Complaint No. 3, and you were getting ready to say

**Page 42**

1  something about Abram Torres; is that right?
2     A.  Uh-huh.
3     Q.  Tell us about that complaint.
4     A.  That was after he came into the office on
5  Main Street and asked me and a couple other employees,
6  I'm not exactly sure which ones, that if we would be
7  willing to sign a complaint to the Department of Labor on
8  his behalf if he was to draw one up due to racial
9  discrimination and equal pay, which I agreed that I
10 would.  I immediately told Luke what Abraham was
11 intending to do.
12    Q.  Do you know what the nature of the complaint
13 that Mr. Torres asked you to sign on his behalf was?
14    A.  He felt he was being racially discriminated
15 against, and there were funds, apparently, that he
16 couldn't account for that he had paperwork for.
17    Q.  And did you investigate Mr. Torres' complaints
18 personally?
19    A.  I didn't.  I just brought these issues to HR for
20 their -- who I believed were and should have been,
21 responsible for handing -- handling any of the negative
22 employee issues.
23    Q.  You state in your complaint, you just testified,
24 that you agreed to sign something on his behalf, right?
25    A.  Yeah.  It's -- to my knowledge, it's basically

**Page 43**

1  just like having his back.  You know what I mean?  Like
2  being there for him.  Being a corporate representative as
3  I was, I didn't want to pull -- or pour fuel on the fire
4  and deny it, so I agreed to.  And then immediately
5  brought it to HR hoping that they would solve it -- solve
6  the -- solve the issue.
7     Q.  Did you ever witness Mr. Torres being
8  discriminated against?
9        MR. STALLWORTH:  Objection.  Vague, also
10 calls for legal conclusion.
11    Q.  (BY MR. PORTO)  Okay.  What were you sign -- I
12 don't understand what you were signing.  Were you signing
13 as a witness to some sort of unlawful act, in your
14 opinion?
15       MR. STALLWORTH:  Objection.  Misstates
16 Plaintiff's testimony as to whether she signed something
17 versus whether, as she stated, she agreed to sign.
18       MR. PORTO:  Well, okay.  That's fair.
19    Q.  (BY MR. PORTO)  You never signed anything,
20 right?
21    A.  Correct.
22    Q.  What were -- what were you being asked to sign?
23 I don't understand.
24    A.  To my knowledge, Mr. Torres wanted an
25 investigation on American Franchise Systems through the

**Page 44**

1  Department of Labor after feeling he was being racially
2  discriminated against.  And with my experience, I --
3     Q.  Okay.  Go ahead.  I'm sorry.
4     A.  With the experience I had thus far with
5  Mr. Miles, as in seeing actual racist memes being sent to
6  him and his uncomfortability (sic), I felt confident
7  that -- I felt confident in supporting his claims.
8     Q.  Did you ever witness Mr. Torres being
9  discriminated against?
10       MR. STALLWORTH:  Objection.  Calls for a
11 legal conclusion.  You can answer.
12    Q.  (BY MR. PORTO)  Go ahead.
13    A.  I don't know.
14    Q.  You don't know if you ever witnessed him being
15 discriminated against?
16    A.  I know what he told me about, you know, being
17 treated unfairly, and then with, like, having issues with
18 his pay and commission, and other issues in regards to
19 that like paperwork just being done incorrectly.  I
20 didn't fully or truly understand the nature of it because
21 I wasn't in his position, so I couldn't see it how he saw
22 it.
23       But if an employee tells me that they're being
24 racially discriminated against, and then another one
25 follows up with that, more than one, I'm going to take it

Page 45

1  seriously.
2  Q. Understood. But you just said you didn't
3  understand what Mr. Torres was complaining about, right?
4  A. Well, he wanted an investigation by the
5  U.S. Department of Labor because he felt he was being
6  discriminated against and they were by race and by pay
7  wage issues.
8  Q. You know -- you know what discrimination means,
9  right?
10 A. Yes.
11 Q. Okay. Did you feel that Mr. Torres was being
12 discriminated against?
13 A. Yes.
14     MR. STALLWORTH: Objection. Speculation
15 and calls for a conclusion.
16 Q. (BY MR. PORTO) Why did you feel Mr. Torres was
17 being discriminated against? Tell me some examples of
18 discriminatory behavior that you observed Mr. Torres was
19 being subject to.
20     MR. STALLWORTH: Same objection. You can
21 answer, if you know.
22 A. I'm not -- I'm not sure.
23 Q. (BY MR. PORTO) I just asked you if you felt
24 Mr. Torres was being discriminated against and your
25 answer was, "Yes," correct?

Page 46

1  A. Correct, because he told me he was.
2  Q. Okay. I'm going to ask you another question.
3  Your answer's, "Correct?"
4  A. Yes, I did say that.
5  Q. Okay. And now I'm asking you to explain why you
6  believe Mr. Torres was being discriminated against.
7  A. Because he seemed to think that he was getting
8  loss of wages and not fair compensation, and had
9  paperwork -- and like I stated before, I didn't really
10 understand the in's and out's of how all that worked.
11 But he said he had paperwork, and then he just came in
12 the next day with -- asking everybody if they would sign
13 it. Basically, if they would agree to his claims.
14 Q. Okay. So let me make this clear. I understand
15 that Mr. Torres believed that he was being discriminated
16 against. Okay? Are we on the same page?
17 A. Yes.
18 Q. My question is, do you, Ms. Pina, believe that
19 Mr. Torres was being discriminated against?
20 A. Yes.
21     MR. STALLWORTH: Objection. Asked and
22 answered --
23 Q. (BY MR. PORTO) I don't think it --
24     MR. STALLWORTH: -- and calls for legal
25 conclusion. Go ahead.

Page 47

1  Q. (BY MR. PORTO) So I would like you to provide
2  me some examples of discriminatory behavior that you
3  personally observed Mr. Torres being subjected to.
4      MR. STALLWORTH: Objection. Asked and
5  answered, calls for a legal conclusion.
6  Q. (BY MR. PORTO) Go ahead and answer.
7  A. I'm unsure.
8  Q. Did you ever observe Mr. Torres being harassed
9  because of his ethnicity?
10     MR. STALLWORTH: Objection. Calls for
11 legal conclusion. You can answer --
12 A. I'm unsure.
13     MR. STALLWORTH: -- if you know.
14 Q. (BY MR. PORTO) You're unsure of whether or not
15 you observed that?
16 A. Correct.
17 Q. Did you ever independently investigate how
18 Mr. Torres was paid?
19 A. I did not. I immediately let HR know, hoping
20 that they would handle all of the negative-related
21 employee issues.
22 Q. I understand that. But I -- you stated that you
23 believed that Mr. Torres was being discriminated against,
24 correct?
25 A. Correct.

Page 48

1  Q. And as you sit here, you're not able to offer a
2  single instance of discriminatory behavior that
3  Mr. Torres was subject to; is that correct?
4      MR. STALLWORTH: Objection. Objection.
5  Argumentative, also misstates Plaintiff's testimony as to
6  why she believed that his complaints were valid based
7  upon her other experiences.
8  A. He sat next to me. Our desks were right next to
9  each other. So whenever he would be disgruntled or upset
10 about these issues, you know, he would express those --
11 those issues, and they seemed to be often. And he -- so
12 it's been so long, like, I can't remember exact details,
13 but it was enough -- more than once that led me to that
14 conclusion.
15 Q. (BY MR. PORTO) Did you ever observe another
16 employee discriminate against Mr. Torres?
17 A. I'm unsure. It's been so long.
18 Q. Do you believe that Juanita Thedford was being
19 discriminated against?
20     MR. STALLWORTH: Objection. Calls for a
21 legal conclusion. You can answer.
22 A. I'm unsure.
23 Q. (BY MR. PORTO) You're unsure whether or not you
24 believe she was being discriminated against?
25 A. I believe she was because she said that she was.

12 (Pages 45 to 48)
Case 4:21-cv-00772-WBG   Document 36-1   Filed 11/02/22   Page 9 of 17
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

**Page 49**

1    And while there were other white employees there allowed
2    to break the rules without consequence, that's why I
3    decided to help her in trying to bridge a gap between her
4    and HR so that they can get these issues resolved.
5        Q.  Did you ever observe another employee treat
6    Ms. Thedford in a discriminatory manner?
7        A.  Not that I can recall.
8        Q.  Other than Mr. Miles, Ms. Thedford and
9    Mr. Torres, did you ever complain regarding any other
10   employees?
11       A.  I -- complained?  No.
12       Q.  Did you know Mr. Miles before you started at
13   Shaman Franchise?
14       A.  No.
15       Q.  Did you know Ms. Thedford before you started at
16   Shaman Franchise?
17       A.  I didn't know anybody.  I'd only met the CEO
18   once.
19       Q.  Did you know Mr. Torres?
20       A.  No.
21       Q.  When's the last time you talked to Mr. Miles?
22       A.  I can't recall.  It's been a while.
23       Q.  Since you left Shaman Franchise, have you spoke
24   to Mr. Miles?
25       A.  Yes.

**Page 50**

1        Q.  What about Ms. Thedford?
2        A.  No.
3        Q.  What about Mr. Torres?
4        A.  Yes.
5        Q.  When's the last time you spoke with Mr. Torres?
6        A.  I can't be too sure of the exact date.
7        Q.  What did you speak to him about?
8        A.  He was actually expressing interest in my media
9    company, helping out a friend of his with some digital
10   marketing.
11       Q.  When you complained, you talk about a
12   February 10th, 2020 meeting where you expressed
13   discrimination concerns by your peers.  Do you recall
14   that meeting?
15       A.  I do.
16       Q.  Tell us about that meeting.
17       A.  Is that the meeting where it involved all of my
18   peers?
19       Q.  You say, "On February 10th, 2020 there was a
20   meeting wherein Plaintiff discussed discrimination
21   concerns by her peers."
22           MR. STALLWORTH:  Nick, I think, just as an
23   interjection real quick.  Sage may have printed off the
24   Petition.  Did you print that off, Sage?
25       A.  Yeah.

**Page 51**

1        Q.  (BY MR. PORTO)  Well, what version of the
2    Petition do you have?  Is it the one that's called Second
3    Amended Complaint?
4        A.  Where would it say that?
5        Q.  First page.  What does your first page say?
6        A.  I don't know if this is -- Second -- oh, yeah,
7    Second Amended Complaint, yes.
8        Q.  Yeah.  And that's a fair point.  I'm not trying
9    to trick you.  I just want to know what you're talking
10   about.  So go to Page 3, Paragraph 24.
11       A.  Okay.  Yes.  Can you, please, repeat the
12   question?
13       Q.  Sure.  Paragraph 24 says, "On February 10th,
14   2020 there was a meeting with staff wherein Plaintiff
15   discussed discrimination concerns by her peers, (Thomas
16   Miles, Olivia O'Dell, Abraham Torres, Juanita, Skye), to
17   Mr. Mancillas and his boss, Leigh (last name known)."
18           Did I read that correctly?
19       A.  Correct.
20       Q.  So we already covered Thomas Miles,
21   Abraham Torres, presuming Juanita means Juanita Thedford,
22   correct?
23       A.  Uh-huh.
24       Q.  Were you aware that Olivia O'Dell had any
25   concerns?

**Page 52**

1        A.  I was, but I -- the meet -- the purpose of the
2    meeting was so that they could express their concerns to
3    HR themselves instead of me being the one to bring it up.
4            So I got the meeting together.  And that's when
5    I allowed them to express all of their concerns, in which
6    they did.
7        Q.  Okay.  I have a couple questions regarding that.
8    The first question is, you stated that you were aware of
9    discrimination concerns made by Olivia O'Dell; is that
10   right?
11       A.  In the meeting?
12       Q.  I'm just looking at your Paragraph 24 where you
13   say, "Plaintiff discussed discrimination concerns by her
14   peers."  Thomas Miles, we've already talked about, right?
15       A.  Yes.
16       Q.  Abraham Torres, we've already talked about,
17   correct?
18       A.  Correct.
19       Q.  Juanita, I presume is Juanita Thedford, and
20   we've already talked about her.  My question is, what
21   discrimination concerns did Olivia O'Dell have?
22       A.  She just expressed being treated differently
23   because of her race.  But she was able to then express
24   them to HR herself, which she did.  So I never
25   expressed -- I never -- they were all in the meeting.  I

Page 53

think that's why they're in parentheses. They were all in that meeting.
Q. So did you ever observe Ms. O'Dell being treated differently because of her race?
A. Not that I can recall.
Q. What was her race?
A. I don't want to assume her race, but she wasn't white.
Q. Okay. It strikes me as strange that -- you were a new hire in February of 2020; is that right?
A. Correct, to the Kansas City location.
Q. And you didn't know any of these people before you started in January of 2020; is that right?
A. Correct.
Q. Did it strike you as odd that these employees are bringing their concerns to you, and then you felt the need to bring them to someone else?
A. There was somewhat of, like, a hostile work environment, and they expressed to me that they were happy I was there because I was going over to the warehouse very often, that I could, kind of, be that communication bridge for them. Because there was a time where they were actually banned from communicating to the warehouse.
Q. So why do you believe that they were expressing

Page 54

these concerns to you as opposed to someone else?
    MR. STALLWORTH: Objection, speculation. You can answer, if you know.
A. I'm unsure.
Q. (BY MR. PORTO) And are you stating that all of the employees identified in Paragraph 24 believed that there was a hostile work environment?
A. Correct.
Q. Okay. Tell me about the nature of the hostile work environment.
A. Well, they witnessed their direct supervisor breaching company handbook with no consequence. They weren't allowed to speak to the warehouse representatives, which made it very hard to communicate for the franchisees.
    And based on, you know, the nature of, like, Thomas' complaint to me and seeing, you know, the racist meme being sent to him, they just didn't feel comfortable that their direct supervisors would handle it appropriately.
    So they wanted to reach out to HR, which only existed through Luke at the other location. And because I was going there often, I would relay that information for them.
Q. You said that -- part of your description of the

Page 55

hostile work environment was a supervisor breaking a handbook?
A. Well, on multiple occasions they would observe white employees working on, like, homework during work hours, and Marc knew about it and, you know, there would be no consequence to it. There was --
Q. Marc who?
A. The manager of the Franchise Systems.
Q. So Marc Sayler, is that who you are referring to?
A. Correct.
Q. And that's S-a-y-l-e-r. Are you saying he's the direct supervisor that broke the handbook?
A. No. He was -- he would -- well, he would -- he would -- I would walk into a room and he walked into a room knowing that an employee was working on her schoolwork on the computer, on the company computer during company time, and didn't do anything about it, and other employees knew about that too.
Q. Okay. Who was that employee?
A. Skye. If not Skye, it was her -- there was two girls, and I don't remember the other one's name. So if it wasn't Skye, it was the other one. But it was one of those two.
Q. Well, Paragraph 24 mentioned Skye being in the

Page 56

meeting where you're discussing discrimination concerns by your peers, including Skye. So does Skye have a discrimination concern?
A. She had her own separate complaints. I don't know whatever became of those. But she never came to me directly. She was just involved in that meeting and did express her own concerns, but I am not aware of what they were.
Q. Okay. Do you know Skye's last name?
A. I don't.
Q. Okay. So who is the supervisor that broke the handbook?
A. Well, the structure of it, I'm still not really exactly sure. But there was the business representative. So all these people that are listed in 24, they had more of, like, a supervisory person that, kind of like, led their team. And then the development manager, that might not be her exact title, Kathi Miley, her and Kathy were in a relationship.
    So fraternization. They were in a relationship. So it was considered, to them, fraternization, which they believed wasn't right, and that went without consequence -- and yeah.
Q. Okay. So you just said a lot there. But I just -- I want the identity -- when I asked you about a

14 (Pages 53 to 56)

Page 61

1 convention?
2 A. I was.
3 Q. And was part of your job responsibility to
4 present your PowerPoint at the convention?
5 A. It was.
6 Q. And did you understand that to be an important
7 part of your job?
8 A. Yeah, and a good opportunity.
9 Q. Tell me what you believe your responsibilities
10 were, with respect to that PowerPoint.
11 A. I knew that it needed to be done by the time I
12 was to get up and present it after I got all the
13 information that I needed.
14 Q. Who told you that?
15 A. That's -- I'm aware of that's what it was.
16 Q. And who told you that?
17 A. Who told me what?
18 Q. Who told you your responsibilities with respect
19 to the PowerPoint?
20 A. Marc Sayler.
21 Q. Did Mr. Sayler ever ask you to see a draft of
22 the PowerPoint in the weeks ahead of the convention?
23 A. He would -- he would check in with me and, kind
24 of, ask, like, how far along I was, and things of that
25 nature. But I would express that, you know, it's not

Page 62

1 done yet, but I still needed more information to obtain
2 from the franchisees in order for it to be complete.
3 Q. Did Mr. Sayler ask you to see a draft of it
4 10 days before the convention?
5 A. He -- it was a more of an informal check-in on,
6 like, the status of it.
7 Q. Did he ask to see it?
8 A. No.
9 Q. Mr. Sayler never asked you to e-mail him a copy
10 of the PowerPoint or go through it with you, or anything
11 like that?
12 A. Upon completion of it, he did.
13 Q. Prior to going to the convention?
14 A. Like I said before, it was more of, like, a
15 check-in to see, like, the status of it. And when I
16 expressed that it wasn't finished yet, because I had
17 information that I needed to obtain while at the
18 conference, it wouldn't be completed.
19 Q. Was Mr. Sayler your ultimate supervisor at
20 Shaman Franchise?
21 A. Yes. So I feel I had --
22 Q. Talk to me -- go ahead.
23 A. So I feel I had multiple. I looked up -- you
24 know, I looked at Vince and Joel also as supervisors.
25 Q. Tell me about every conversation you ever had

Page 63

1 with Mr. Sayler regarding the PowerPoint before the trip
2 in Las Vegas.
3 A. It's hard to recall every single one. But he
4 asked me if I would be interested in presenting. I said,
5 "Yes." He basically gave me, like, the topic that I
6 needed to go through. And I said, "Okay." And then
7 there would be a couple sporadic check-ins that I would
8 get about, you know, the status of it.
9 And then while traveling to Vegas, I grabbed the
10 wrong laptop. I grabbed my personal and forgot my work
11 laptop, in which I expressed to him when I saw him in
12 Vegas, and he had already heard about it and he just,
13 kind of, laughed it off, and it was, like, really fun
14 kind of moment. He said, "You know what? Don't worry
15 about it. It's not that big of a deal."
16 But I did -- I worked really hard to get it, to
17 get it sent to me from Vegas, and it did get sent to me
18 from Vegas (sic). And then the next day, after him
19 telling me not to worry about it, we'll figure it out,
20 it's all -- it's all good, he, kind of, asked me again,
21 like, six -- five or six hours before the presentation,
22 you know, which I had plenty of time to finish, and I was
23 going to get the information that I needed.
24 He seemed very opposite of the previous night,
25 disgruntled, condescending and said, "Well, then I'll

Page 64

1 just do it." I said, "Okay," that he could do it. And
2 that's about everything that we talked about it when it
3 comes to that.
4 Q. So you don't deny that the PowerPoint was not
5 complete by the time you arrived in Las Vegas; is that
6 correct?
7 A. By the time I arrived in Vegas, I had a couple
8 more pieces that I needed to obtain from franchisees.
9 But it would have been complete by the time I needed to
10 present it.
11 Q. It wasn't complete by the time you arrived in
12 Las Vegas; is that correct?
13 A. It was.
14 Q. But you just said you had a couple more items to
15 complete.
16 A. To make it more of, like, a collective, like,
17 conversation amongst everybody. I mean, the logistical
18 points that we wanted to get across were done.
19 Q. But you had additional work that you wanted to
20 put into PowerPoint when you got to Las Vegas, correct?
21 A. Correct.
22 Q. And was it your understanding that the
23 PowerPoint was to be done before you ever went to
24 Las Vegas?
25 A. No.

Page 65

1  Q. Was it your understanding that you were supposed
2  to bring the PowerPoint with you to Las Vegas?
3  A. Correct.
4  Q. And you failed to do that, right?
5  A. It was an honest mistake. I grabbed the wrong
6  laptop. But I -- I got --
7  Q. I'm not saying it was not an honest mistake.
8  I'm saying, was that a mistake?
9  A. Can you repeat the question?
10 Q. Was it a mistake to not bring your laptop to
11 Las Vegas?
12 A. No.
13 Q. It was not a mistake to not -- were you being
14 paid to create the PowerPoint?
15 A. I was being paid, but it wasn't a mistake --
16 Q. And you were being paid --
17 A. -- because I got the laptop.
18 Q. And you were being paid to present this
19 PowerPoint in Las Vegas, correct?
20 A. Correct.
21 Q. Part of that responsibility involved bringing
22 the laptop to Las Vegas, correct?
23 A. Correct.
24 Q. And you failed to bring the PowerPoint to
25 Las Vegas, correct?

Page 66

1  A. It ended in Vegas with me.
2  Q. This will be -- that's fine. Did you bring the
3  PowerPoint to Las Vegas when you got on the plane?
4  A. Initially, no.
5  Q. Okay. And it's your testimony that the first
6  time Mr. Sayler -- this was brought to Mr. Sayler's
7  attention, he laughed it off?
8  A. Yeah. We were on a party bus getting ready to
9  go out with a group of us and he did laugh it off.
10 Q. And then the next day, Mr. Sayler was upset?
11 A. Yes.
12 Q. Tell me how you were able to -- so the laptop
13 was on a computer back in Kansas City; is that right?
14 A. Correct.
15 Q. And you were in Las Vegas?
16 A. Yes.
17 Q. And was this computer located at Mr. Zicarelli's
18 home where you resided?
19 A. Yes.
20 Q. Tell me about the circumstances how you were
21 able to get the PowerPoint to you in Las Vegas?
22 A. With the help of Luke, who stayed back in
23 Kansas City and did not come, I paid for a locksmith,
24 with Mr. Zicarelli's permission, and while giving Luke
25 permission to enter the house, to obtain the laptop, get

Page 67

1  into it, and then e-mail me the files.
2  Q. So you hired a locksmith to go to
3  Mr. Zicarelli's home and pick the lock?
4  A. To get inside, yes. Because Stephen and I were
5  in Vegas, so we couldn't let him in.
6  Q. So you were with Mr. Zicarelli in Las Vegas?
7  A. Sorry?
8  Q. You were with Mr. Zicarelli in Las Vegas?
9  A. He was a part of the business conference. He
10 was there.
11 Q. Did you acknowledge any wrongdoing with respect
12 to requiring Mr. Mancillas to go to your apartment to
13 assist a locksmith in picking the lock to deliver this
14 PowerPoint to you in Las Vegas?
15 A. Can you repeat the question?
16     MR. PORTO: Go ahead and read that back,
17 if you would.
18     (The question was read back by the
19 reporter as follows: QUESTION: "Did you acknowledge any
20 wrongdoing with respect to requiring Mr. Mancillas to go
21 to your apartment to assist a locksmith in picking the
22 lock to deliver this PowerPoint to you in Las Vegas?")
23 A. No.
24 Q. (BY MR. PORTO) You think that was perfectly
25 within your normal job responsibilities?

Page 68

1  A. He offered to help.
2  Q. What time of day was that at?
3  A. It was -- I mean, I let him know -- he got
4  involved initially because I was going to contact IT to
5  see if there was a way to get on the server remotely, but
6  that wasn't an option.
7     So then he offered, you know, "Is there anything
8  else I can do?" And I just -- I thought, well, if you
9  want to go by there and grab it, open it up really fast
10 and send me the files, that would be fine, and he agreed.
11 Q. What time of day was that at?
12 A. I can't recall. It was after I landed in Vegas,
13 either that evening or the very next morning.
14 Q. Was it during Mr. Mancillas' work day?
15 A. I can't recall.
16 Q. Do you know if Mr. Mancillas was on the clock?
17 A. I don't know.
18 Q. Do you think that was an efficient use of
19 Mr. Mancillas' time to go break into someone's apartment
20 with a locksmith and e-mail you this laptop?
21 A. He offered. I mean, I wasn't aware of his work
22 schedule.
23 Q. This all could have been avoided had you just
24 done what you were required to do and bring it to -- with
25 you to Las Vegas, right?

17 (Pages 65 to 68)
Case 4:21-cv-00772-WBG   Document 36-1   Filed 11/02/22   Page 13 of 17
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

Page 69

1    MR. STALLWORTH: Objection. Calls for
2 speculation, argumentative. You can answer, if you know.
3    A. I don't know.
4    Q. (BY MR. PORTO) You don't know if Mr. Mancillas
5 e-mailing you the PowerPoint could have been avoided had
6 you done what you were supposed to do and bring it to
7 Las Vegas?
8    A. I don't know.
9    Q. You don't deny that you were supposed to bring
10 the PowerPoint to Las Vegas, right?
11    A. No.
12    Q. You also don't deny that you had additional work
13 to do on the PowerPoint in Las Vegas?
14    A. Finishing touches, yes.
15    Q. Tell me where you were when you finally received
16 the PowerPoint from Mr. Mancillas.
17    A. I was in my hotel room.
18    Q. Who were you in the hotel room with?
19    A. Myself.
20    Q. Okay. What did you do upon receiving it?
21    A. Immediately got to work.
22    Q. At some point, did you show it to Mr. Sayler?
23    A. We never got to that point until he told me he
24 was going to do it.
25    Q. Did you tell Mr. Sayler it wasn't done?

Page 70

1    A. I just expressed that there was a couple of
2 things that I wanted to add to it, but I would be ready
3 to present at the time that it needed to be presented.
4    Q. Did Mr. Sayler express his frustration with you
5 for the fact that it was not completed?
6    A. He did, which was confusing because the previous
7 night he told me not to worry about it, and that it
8 wasn't a big deal.
9        And thus far in my employment with this company
10 I was not micro-managed at all. I worked very
11 independently. So it wasn't odd for me to feel as though
12 I could continue working independently without
13 consequence because they liked everything I did thus far.
14        So after he expressed not to worry about it, I
15 figured I would just be able to do what I was going to do
16 and present it at the time it needed to be presented.
17    Q. Where were you staying in Las Vegas?
18    A. Caesar's.
19    Q. Who paid for that?
20    A. American Shaman, I assume.
21    Q. Did American Shaman also pay for your travel to
22 Las Vegas?
23    A. Yes.
24    Q. And part of your responsibilities in Vegas were
25 to give this presentation, correct?

Page 71

1    A. Yes.
2    Q. And you ultimately did not give that
3 presentation, correct?
4    A. Marc told me he was going to do it, and I agreed
5 that he could do it.
6    Q. Part of your responsibilities were also to
7 finish the PowerPoint; is that right?
8    A. Yes.
9    Q. And you never finished it, correct?
10    A. It was ready to be presented. It would have
11 been ready to be presented at the time that it needed to
12 be presented.
13    Q. So it wasn't ready, right?
14    A. It was ready, because it could have been
15 presented without the information that I needed. I just
16 wanted to -- for it to be perfect. I'm kind of a
17 perfectionist. So the little details I wanted to add
18 were just to add some character in, you know, a very fun
19 presenting environment with the people that I was going
20 to be, you know, giving the presentation to.
21        So the logisticals behind what he wanted the
22 presentation to be about was complete. I just was
23 putting my own little swing on it to make it fun, since I
24 was the one that's going to be presenting it.
25        But it would have been ready to go by the time I

Page 72

1 was ready to present, yes, without me adding the extra
2 details.
3    Q. But you, being a perfectionist, you never gave
4 it your final stamp of approval, did you?
5    A. Sorry?
6    Q. You, being a perfectionist, you never gave it
7 your final stamp of approval; is that correct?
8    A. No.
9    Q. Were you satisfied with your efforts in not
10 bringing this to Las Vegas?
11    A. Can you repeat that?
12    Q. Were you satisfied with your efforts in not
13 bringing this to Las Vegas?
14    A. I guess I don't understand the question.
15    Q. Did you think it was a mistake to not bring the
16 laptop to Las Vegas?
17    A. No. Especially after Marc told me not to worry
18 about it the next day.
19    Q. Well, if you didn't think it was a mistake, why
20 did you hire a locksmith to go pick the lock at
21 Mr. Zicarelli's apartment?
22    A. I thought it was the right thing to do.
23    Q. Did you think it was right -- okay.
24    A. I had worked -- I mean, I had worked on it up
25 until that point.

18 (Pages 69 to 72)
Case 4:21-cv-00772-WBG   Document 36-1   Filed 11/02/22   Page 14 of 17
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

Page 81

1    A. No.
2    Q. Okay.
3       MR. PORTO: I want to take a quick break.
4    I have just a few more questions.
5       (Off the record at 10:56 a.m. until
6    11:02 a.m.)
7    Q. (BY MR. PORTO) Ms. Pina, before you went to
8    Las Vegas, you communicated with Mr. Sayler regarding the
9    presentation. You testified to that earlier, correct?
10   A. He would check in occasionally, yes.
11   Q. Would he check in by e-mail or in person?
12   A. Both.
13   Q. Did you check in with anyone else -- did you
14   discuss the PowerPoint with anyone else besides
15   Mr. Sayler before going to Las Vegas?
16   A. I can't recall. Possibly, just, you know,
17   talking about, you know, what I was doing or, you know,
18   nothing specific.
19   Q. You said that the first time you'd spoke with
20   Mr. Sayler in Las Vegas was on a party bus; was that
21   right?
22   A. Correct.
23   Q. Were you partying?
24   A. I had just gotten there, because we were part of
25   the flight I got in late. So that was the first time I

Page 82

1    had stepped out in Vegas.
2    Q. Were you drinking?
3    A. Not at that point.
4    Q. Was Mr. Sayler?
5    A. My --
6    Q. The party bus implies a party, right?
7    A. Correct. But I'm -- I'm unsure of what he was
8    doing previous to me being there.
9    Q. Was it kind of a jovial environment with the
10   team in Las Vegas on the bus?
11   A. There weren't drinks allowed on the bus, so
12   there was no alcohol around.
13   Q. You were terminated by Shaman Franchise on
14   February 18th, 2020; is that correct?
15   A. I don't recall the exact date.
16   Q. You were terminated though?
17   A. Yes.
18   Q. Who terminated you?
19   A. Luke Mancillas handed me a severance.
20   Q. Did you sign the severance?
21   A. I did not.
22   Q. When Mr. Mancillas came to you with the
23   severance, were you then later terminated?
24   A. I assume that it came hand-in-hand. But I did
25   stick around for a while to hopefully get a meeting with

Page 83

1    Vince, which I was told I was going to be able to have.
2    Q. So was Mr. Mancillas the person who terminated
3    you?
4    A. He was the one that handed me the severance, but
5    he expressed that it wasn't his doing and he tried to
6    reverse it and that he was sorry.
7    Q. Where did this meeting happen at?
8    A. Sorry?
9    Q. Where did this meeting happen at?
10   A. At the warehouse.
11   Q. Okay. Was anyone else present?
12   A. Not that I can recall.
13   Q. Did you and Mr. Sayler ever discuss this
14   PowerPoint incident back in Kansas City after the trip to
15   Las Vegas?
16   A. No. That was the last time I spoke to him when
17   I saw him and he said he was going to do the PowerPoint.
18   Q. You stated that you asked for a meeting with
19   Vince; is that right?
20   A. Correct.
21   Q. Who did you ask that of?
22   A. Luke -- well, the meeting the day before Vegas
23   that we had, we were promised that we would all get a
24   meeting with Vince after -- after the Vegas meeting. So
25   I was assuming that that meeting was going to happen

Page 84

1    still. And it was supposed to be at --
2    Q. Are you stating -- go ahead.
3    A. So we had asked for the meeting with all of us
4    with Vince that day. But after I was terminated, I still
5    requested to speak to Vince.
6    Q. What did you want to speak to Vince about?
7    A. Well, at that point, I wanted to talk to him
8    about me being fired and express to him that I am still
9    an asset and that there has been a huge misunderstanding.
10   Q. What was the misunderstanding?
11   A. Well, I wasn't given a reason as to why I was
12   fired, and then was told by the, then, company attorney
13   that I didn't need a reason. So I was just looking to
14   find information.
15   Q. So the misunderstanding was, was that you didn't
16   know the reason you were being terminated?
17   A. Correct.
18   Q. Who told you you didn't need a reason?
19   A. I cannot remember what his name is, but he was
20   the attorney at the time for American Shaman.
21   Q. Did anyone ever tell you that the reason you
22   were being terminated was associated with your misconduct
23   in Las Vegas?
24   A. No.
25   Q. Did you ever associate your termination with

21 (Pages 81 to 84)

85

1 your misconduct in Las Vegas?
2   A. No.
3   Q. So it sounds to me like you wanted to have a
4 second -- or I guess a meeting for a second purpose with
5 Mr. Sanders, and that was to discuss your reasons for
6 termination?
7   A. No. I wanted to, first, discuss the issues of
8 discrimination that I brought to Luke's attention by my
9 peers, which was the most important thing. That we were
10 already supposed to have a meeting. It was scheduled and
11 everything. It was supposed to be at 3:00. I followed
12 up with Luke. I was -- I was persistent about that.
13  Q. This was after you got back from Las Vegas?
14  A. While I was traveling back, or like -- yeah,
15 that morning maybe. I texted him and asked him, like,
16 what time the meeting was and he said, 3:00 -- 3 o'clock,
17 or something like that.
18  Q. And was this supposed to take place before you
19 were terminated?
20  A. Yes. This is the meeting that was going to
21 involve all of the employees that were going to bring
22 their issues to Vince himself.
23  Q. But did -- my question is, did you expect to
24 have another meeting regarding the reasons for your
25 termination, because you said there was a

86

1 misunderstanding?
2   A. Correct.
3   Q. So was there two meetings with Mr. Sanders that
4 you expected, or one?
5   A. Two.
6   Q. Okay. So what meeting was supposed to be with
7 the group, and then you wanted to have another individual
8 meeting with Mr. Sanders?
9   A. After I received my severance, yes.
10  Q. Are you -- are you stating you did receive a
11 severance?
12  A. He handed me a severance.
13  Q. But you never -- you did not accept that, right?
14  A. I never signed it, no.
15  Q. Did you ask for a meeting with Mr. Sanders
16 regarding the reasons for your termination?
17  A. Yes.
18  Q. Who did you ask that of?
19  A. I texted him personally.
20  Q. Did he respond?
21  A. He did not.
22  Q. In Paragraph 37 of your Second Amended Complaint
23 it says, quote, "Plaintiff was told that she could not
24 meet with the CEO." Who told you that?
25  A. I want to say the lawyer and then Luke again.

87

1 Because I waited around for a couple hours and he never
2 showed up, and then that's when they said that he had
3 left, and that I wasn't allowed to have a meeting with
4 him.
5   Q. So this is before you were terminated, right?
6   A. No. This took place after.
7   Q. You stayed for a couple hours after you were
8 terminated?
9   A. Well, because I was told I would be able to meet
10 with Vince. I was -- it was -- I was under the
11 impression I was going to go still meet with him up until
12 abruptly they said no, he left, and that I couldn't. So
13 I -- the whole time I was there, I was under the
14 impression I was waiting for him.
15  Q. Well, so I'm confused because your Second
16 Amended Complaint says, "Plaintiff was told she could not
17 meet with the CEO," but now you're stating that you
18 believe that you were meeting with him. Which is true?
19  A. They said that I could meet with him, and then I
20 waited around. I got paperwork together and was going to
21 present to him just everything I've done, show him how I
22 have been of value to this company, and just try to at
23 least have him hear my side of the story.
24      And then I was told abruptly I could not meet
25 with him. So I was supposed to have the meeting with all

88

1 of my peers, and then I was also supposed to speak with
2 him in regards to the termination.
3   Q. Part of your story with respect to your intended
4 meeting with Mr. Sanders, includes a discussion of your
5 side of the story with respect to the PowerPoint?
6   A. No.
7   Q. So after you were terminated by Mr. Mancillas,
8 how long did you remain at the Shaman Franchise office
9 for?
10  A. Maybe around an hour.
11  Q. You stated Mr. Mancillas terminated you at the
12 warehouse, though, right?
13  A. That's -- well, see, I'm getting confused.
14 That's where I was the whole time. I never went back to
15 Main Street.
16  Q. So you were terminated at 2405 Southwest
17 Boulevard; is that right?
18  A. That's where he handed me the severance, yes.
19  Q. And you stayed there for an hour?
20  A. Yes. I was utilizing a computer and our printer
21 there.
22  Q. Okay. What were you utilizing the computer for?
23  A. I had asked my peers to write a little -- like,
24 a paragraph or two on my work performance, since they
25 watched me, you know, every day, like, work. Just to

22 (Pages 85 to 88)
Case 4:21-cv-00772-WBG  Document 36-1  Filed 11/02/22  Page 16 of 17
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

Page 89

1  kind of like go over my work ethic and some -- how
2  invaluable.
3       And they all sent e-mails to me that was for
4  him, or whoever, you know, might have been in the
5  meeting. So I was printing those out so that I could
6  have them to give to him.
7   Q. Do you still have those e-mails?
8   A. I do.
9   Q. Who wrote e-mails on your behalf?
10  A. Shea Horstman, Abraham, Olivia, and I -- there
11 was another, I think, but I can't recall. But I know
12 those three.
13  Q. So the evening of February -- you were
14 terminated on February 18th, 2020. That evening, were
15 you still residing with Mr. Zicarelli?
16  A. I was, but he let me know when I went back to
17 the residence that I had two weeks to get out. I think
18 out of respect for me he gave me two weeks. But, he --
19 yes.
20  Q. Why did Mr. Zicarelli say you had two weeks to
21 get out?
22  A. He knew that I didn't have any family or friends
23 in the area, and I think that he just didn't want to put
24 me out on the street. Decency.
25  Q. Okay. Was Mr. Zicarelli telling you that you

Page 90

1  could no longer live with him, like, related to you're no
2  longer working for Shaman Franchise?
3   A. No.
4   Q. It's just a coincidence that it happened the
5  same day as you were terminated?
6   A. Yes.
7   Q. Did you continue to reside with Mr. Zicarelli
8  for the following two weeks?
9   A. I can't recall. I might have gotten out sooner.
10 It was two years ago. It's hard to remember the exact
11 time frame.
12  Q. Where did you go from Mr. Zicarelli's apartment
13 when you left there?
14  A. I went back to Chastity's, where I was staying
15 prior to living with him, and then back to my hometown
16 shortly after that.
17  Q. When did you go back to Hutchinson?
18  A. March. End of February or March.
19  Q. Beginning when you left Shaman in February of
20 2020, tell me about your subsequent employment. What was
21 the first job you located?
22  A. I was bartending, waitressing and bartending at
23 a couple of local places. And I opened up a -- I started
24 a media company, so I created an LLC.
25  Q. Where were you bartending and waitressing at?

Page 91

1   A. AJ's.
2   Q. Is that in Hutchinson?
3   A. Yes.
4   Q. And when did you start there?
5   A. Like, spring of 2021.
6   Q. Can you define "spring" a little bit more?
7   A. April, maybe.
8   Q. April of '21?
9   A. Yeah. We were in a pandemic the whole year
10 prior.
11  Q. I remember the pandemic. So what was the first
12 job that you -- what was your first employment after
13 leaving Shaman?
14  A. AJ's.
15  Q. So you were unemployed from February of 2020 to
16 April of 2021?
17  A. Correct.
18  Q. And you were working on your media company?
19  A. Getting it started, yes.
20  Q. What was the name of your media company?
21  A. Called, Crude Media.
22  Q. And where did you form that at?
23  A. Hutchinson, Kansas.
24  Q. Is that an LLC? Crude Media, LLC?
25  A. Yes.

Page 92

1   Q. What kinds of things did Crude Media do?
2   A. We do marketing and digital multimedia services
3  for small and local businesses, artists and musicians.
4   Q. According to Kansas Secretary of State, Crude
5  Media was formed in August of 2020. Does that sound
6  about right?
7   A. Yes.
8   Q. By someone named Emilio Martinez?
9   A. Yes.
10  Q. Who is Emilio Martinez?
11  A. He's my business partner.
12  Q. Did you start working for Crude Media in August
13 of 2020?
14  A. Correct.
15  Q. So you were completely unemployed between
16 February of '20 and August of 2020?
17  A. Correct.
18  Q. Did you file for unemployment benefits regarding
19 your departure from a Shaman Franchise?
20  A. Yes.
21  Q. Did you receive unemployment benefits?
22  A. Yes.
23  Q. In Paragraph 54 of your Complaint, you state,
24 "Defendants' actions against Plaintiff have caused her
25 pain, anguish, anxiety and distress."

Case 4:21-cv-00772-WBG   Document 36-1   Filed 11/02/22   Page 17 of 17
23 (Pages 89 to 92)
CRAWFORD REPORTING -- CrawfordReporting@gmail.com