# Transcript of the Testimony of
# Leigh Geither

**Date:** May 18, 2022

## Sage Pina vs. Shaman Botanicals

CRAWFORD REPORTING
(816) 507-9630
CrawfordReporting@gmail.com



**Page 5**

Q. Good morning, Ms. Geither.
A. Good morning.
Q. As I indicated previously, my name is Shaun Stallworth and I am representing Sage Pina in her litigation against the Defendants in this case. Would you please state your full name for the record?
A. Leigh Ann Geither.
Q. And what is your date of birth?
A. 1/24/64.
Q. What is your current address?
A. 6618 Long Avenue, Shawnee, Kansas 66216.
Q. Okay. Are you on any medications that would keep you from answering any and all of my questions truthfully today?
A. No.
Q. All right. Ms. Geither, I am pulling up what's been marked as Plaintiff's Exhibit No. -- what's that?
A. Nothing.
Q. All right. I am pulling up what's been marked as Plaintiff's Exhibit No. 6. Can you see this document?
A. Yes.
Q. All right. Obviously, we are taking this document -- excuse me, taking this deposition remotely today. And so I will be sharing my screen and obviously we are in a different age where we can do more of this

**Page 6**

remote work. So I want you to let me know if ever there is a time when you can't view this.
But this is just a notice of the deposition of American Shaman Franchise Systems, Inc's corporate representative. Do you see that, ma'am?
A. Yes.
Q. This just indicates the deposition shall take place today, Wednesday, May 18th. Initially it said 9:00 a.m. but of course we're beginning at 10:00 a.m. Central Standard Time, okay?
A. Yes.
Q. It also references a number of topics that are listed for the corporate examination today, listed as Exhibit A. I am pulling up this Exhibit A. Do you see this document, ma'am?
A. Yes.
Q. Okay. And that says, "Topics for Examination," correct?
A. Correct.
Q. All right. And you understand that you are here today to provide testimony in this particular case, correct?
A. Correct.
Q. Ms. Geither, have you ever had your deposition taken previously?

**Page 7**

A. In this case?
Q. In general.
A. Yeah, I have.
Q. Okay. All right.
So you might be an old hand at this. Let me just do a couple of ground rules to refresh your recollection.
MR. PORTO: I object to calling Ms. Geither an "old hand."
Q. (BY MR. STALLWORTH) Fair enough. I meant it in the most colloquial way possible.
Just a couple reminders, that I am going to ask you a number of questions. Then I just ask that you respond verbally to those questions, okay?
A. Okay.
Q. All right. And I'll just ask that you let me ask all my questions to you first and then give you an opportunity to respond. Is that all right?
A. Yes.
Q. As I indicated, I don't anticipate us being here long today. I don't think we will need to break for lunch or anything. My thought is we will be done by then.
But if you do need to take a break, I will ask that you just let me know and I am happy for us to take a

**Page 8**

break, okay?
A. Okay.
Q. All right. And you are doing fine with responding verbally.
So can you tell me what was the basis for Sage Pina's termination?
A. Sage was terminated because we had a big conference that we do every year in Las Vegas for our franchisees. She had a big presentation that she was supposed to have ready and present at the conference.
When she got to the conference, she had forgotten her laptop with her presentation on it. So she tried to get someone in the office that was here to e-mail her her presentation so she could finish it because she hadn't even completed it yet.
And when her supervisor, Marc Saylor, found out about it, he tried to work with her on it to get it completed. But she got kind of angry and stormed out of the room and we had to find someone else to do the presentation.
Q. Okay. All right. I just want to break that down so I can make sure I'm understanding.
A. Okay.
Q. You indicated that there was a presentation she was supposed to perform for a big conference; is that

Page 9

1  right?
2  A. Correct.
3  Q. All right. Do you recall when or where about
4  the conference was supposed to take place?
5  A. Yeah. It was in Las Vegas at Caesar's Palace.
6  I believe the dates were March -- I don't know. I don't
7  remember the exact dates. But it was March of 2020.
8      Sorry, February of 2020, because it was around
9  Valentine's Day.
10 Q. Okay. You indicated that she had this
11 presentation, correct?
12 A. She had started it, correct.
13 Q. Was there a deadline for her to have the
14 presentation finished?
15 A. Yes. There was a deadline. She was supposed to
16 present it I believe on the -- I don't remember the exact
17 days we were there, if it was during the week or not.
18 But it was supposed to be during the main conference.
19 Q. I understand that that's when the presentation
20 was supposed to occur. Was there a deadline for her to
21 complete the presentation?
22 A. It was supposed to be before we went to Las
23 Vegas.
24 Q. When was that?
25 A. Let me think. I think we were there February

Page 10

1  12th through the 14th. So she should have had it done I
2  believe at least a week before so Marc Saylor could
3  review it.
4  Q. Okay. So it's your recollection that the
5  presentation should have been finalized or at least
6  completed the week before?
7  A. Correct.
8  Q. Okay. And what are you basing that upon?
9  A. Just from what Marc Saylor had told me, what the
10 expectations of her were.
11 Q. Is that in writing, that the presentation should
12 have been completed the week before?
13 A. That I am not aware of.
14 Q. Okay. You don't have any contemporaneous
15 documents indicating that the presentation should have
16 been completed one week before the conference, correct?
17 A. I do not, no.
18 Q. Okay. You don't have any personal knowledge
19 that the presentation should have been completed one week
20 before the conference, correct?
21 A. Correct.
22 Q. You have not seen any documents that the
23 presentation should have been completed one week before
24 the conference, correct?
25 A. Correct.

Page 11

1       MR. PORTO: Shaun, I wanted to interject,
2  just so we are clear on the record. Ms. Geither has been
3  noticed today as the corporate representative of the
4  Shaman Defendant. And it appears you are asking
5  questions of her in her individual capacity. I just want
6  to make sure for the record, if you can attempt to
7  clarify that as you go forward.
8       MR. STALLWORTH: Well, I guess a couple
9  things. One, since Ms. Geither had indicated that she
10 made the statement that the presentation was due and that
11 was the basis for the termination, and the corporate rep
12 notice indicates that the factual circumstances related
13 to the termination. So I think this all would relate to
14 the termination if the statement has been made that she
15 should have provided this presentation one week before
16 the Las Vegas conference.
17      MR. PORTO: I have no problem with that.
18 I just want to make sure that when you are asking
19 questions of Ms. Geither about her knowledge, if you
20 could attempt to distinguish between what she knows
21 individually and what she knows as the corporate
22 representative.
23      MR. STALLWORTH: That's fair. And I would
24 suppose that later on there would be an evidentiary
25 determination about what would bind her as the corporate

Page 12

1  representative versus as a fact witness. Sure. I will
2  clarify that with any questions that I may have going
3  forward as far as her personal knowledge.
4       MR. PORTO: I appreciate it.
5  Q. (BY MR. STALLWORTH) Okay. Ms. Geither, as we
6  sit here today, and when I say you -- let me rephrase it.
7       I typically say this a little bit earlier. That
8  is a fair question that your counsel brought up. Let me
9  go ahead and say this now.
10      For our purposes today, since this deposition is
11 noticed up as a corporate representative of American
12 Franchise Systems, Inc., when I say "you," I am
13 referencing the company, okay?
14 A. Okay.
15 Q. And so can we agree that when I say you, that I
16 am necessarily referring to your capacity as the
17 corporate representative of American Shaman Franchise
18 Systems, Inc.? Can we agree with that?
19 A. Okay.
20 Q. Okay. If I have to distinguish otherwise when I
21 say your personal knowledge, then I am just referencing
22 your personal knowledge as an individual, as a fact
23 witness. But when I am saying "you," I am specifically
24 representing -- or specifically referencing American
25 Shaman Franchise Systems, Inc., okay?

Page 13

1  A. Okay.
2  Q. All right. And just to be clear, do you have
3  any knowledge of any contemporaneous documents
4  instructing Ms. Pina to present the presentation to
5  Mr. Saylor at any point before the Las Vegas conference?
6  A. No.
7  Q. Now, I understand that this deposition is
8  noticed for American Shaman Franchise Systems, Inc.
9  Could you explain to me, what is the difference between
10 American Shaman Franchise System, Inc., and Shaman
11 Botanicals, LLC?
12 A. Yes. Shaman Botanicals, LLC is the manufacturer
13 of the CBD product that we sell to the franchisees, who
14 purchase franchises through American Shaman Franchise.
15 Q. Okay. You spoke a little quick there. So I
16 want to make sure that I understood that to break it
17 down.
18 A. Okay.
19 Q. We may do this a couple times, because I am a
20 little slow in my mind sometimes to break this down a
21 little bit and make sure I understand.
22     As I understand your testimony, Shaman
23 Botanicals is the manufacturer of the CBD products; is
24 that right?
25 A. Correct.

Page 14

1  Q. Okay. Who then would sell the products to the
2  various franchisees; is that right?
3  A. Correct.
4  Q. And so American Shaman Franchise Systems, Inc.,
5  is that a franchise so to speak or is that sort of the
6  main company that distributes the franchises to
7  franchisees?
8  A. Yeah, that's the main company that sells
9  franchises.
10 Q. Okay. So Shaman Botanicals is the manufacturer,
11 American Shaman Franchise Systems, that is the entity
12 that sells the franchises to franchisees, correct?
13 A. Correct.
14 Q. All right. What is the location for Shaman
15 Botanicals?
16 A. It is located at 2405 Southwest Boulevard in
17 Kansas City, Missouri 64108.
18 Q. And what is the location for American Shaman
19 Franchise Systems, Inc.?
20 A. We just moved to 1501 Iron Street, in North
21 Kansas City, Missouri. 64116 is the zip code.
22 Q. Now, in or around February 2020, what was the
23 location of American Shaman Franchise Systems, Inc.
24 A. It was 2300 Main, Suite 165, Kansas City,
25 Missouri 64108.

Page 15

1  Q. All right. Now, Shaman Botanicals, LLC, do you
2  know who the owner is of Shaman Botanicals, LLC?
3  A. Yeah.
4  Q. Who is that?
5  A. Vince Sanders.
6  Q. Okay. Do you know who the owner of American
7  Shaman Franchise Systems, Inc., is?
8  A. Yes.
9  Q. Who is that?
10 A. Vince Sanders.
11 Q. Do you know what Mr. Sanders' residency is?
12 A. His address or where, what state?
13 Q. Rather what state, ma'am.
14 A. He lives in Kansas.
15 Q. Do you know how many employees Shaman
16 Botanicals, LLC, has?
17 A. We have about 65.
18 Q. Do you know how many employees American Shaman
19 Franchise Systems, Inc., has?
20 A. There's about 10.
21 Q. And which entity employed Ms. Pina?
22 A. American Shaman Franchise Systems.
23 Q. Okay. And what address did she work at?
24 A. She worked at 2300 Main, Suite 165.
25 Q. And what was her role?

Page 16

1  A. She was the SCO. I don't know if she had
2  another --
3  Q. I'm not great with acronyms. If you could break
4  that down, what does that mean?
5  A. She was like our social media marketing person.
6  Q. Okay. All right. Now, let me go back a moment.
7  Who made the decision to terminate Ms. Pina?
8  A. Marc Saylor.
9  Q. Anyone else?
10 A. Not to my knowledge.
11 Q. Was anyone -- let me clarify. Was anyone else
12 involved in the decision to terminate Ms. Pina?
13 A. Marc Saylor spoke to me about it.
14 Q. What did he say to you?
15 A. He just explained to me the situation and that
16 he wanted to term her.
17 Q. What did you say?
18 A. I told him it was his employee and I agreed with
19 his decision.
20 Q. Did you talk to Ms. Pina before she was
21 terminated?
22 A. I did not, no.
23 Q. And what did Mr. Saylor tell you regarding the
24 situation?
25 A. Just that she did not complete her presentation

Case 4:21-cv-00772-WBG   Document 36-2   Filed 11/02/22   Page 4 of 15
4 (Pages 13 to 16)
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

Page 17

1  for the conference and refused to complete it. So we had
2  to get other people to take care of it.
3      Q. Anything else?
4      A. That's it that I recall.
5      Q. Do you recall when the decision was made?
6      A. It was after we got back from Las Vegas but I
7  don't remember the exact date.
8      Q. Are you aware of any previous complaints
9  regarding Ms. Pina by any other employees or customers?
10     A. No, I am not aware of any.
11     Q. Are you aware of whether or not Ms. Pina was
12 previously disciplined?
13     A. No, I am not aware.
14     Q. So she didn't receive any written warnings or
15 suspensions or anything of that nature, correct?
16     A. Correct.
17     Q. Are you aware of whether or not Mr. Saylor
18 actually received a presentation from Ms. Pina?
19     A. I believe he received the presentation that was
20 like halfway done.
21     Q. Did you review the presentation?
22     A. I did not, no.
23     Q. So you don't know whether or not it was halfway
24 done, complete or anything of that nature, correct?
25         MR. PORTO: I will object to the form of

Page 18

1  the question. It is vague as to the nature of the
2  corporate representative, nature of Ms. Geither's
3  testimony.
4      Q. (BY MR. STALLWORTH) Ma'am, do you know what was
5  incomplete about it?
6      A. I do not know the exact specifics that were not
7  complete, no.
8      Q. Now, ultimately you indicated that Ms. Pina was
9  terminated, correct?
10     A. Correct.
11     Q. She was terminated at some point upon returning
12 to -- rather, after the conference in Vegas was complete,
13 correct?
14     A. Correct.
15     Q. Now, pulling up a severance agreement that was
16 offered to Ms. Pina. Do you see this, ma'am?
17     A. I do.
18     Q. All right. And the severance agreement
19 indicates in the initial preamble that, "The severance
20 agreement is made and entered into on this 18th day of
21 February 2020 by and between Ms. Pina and Shaman
22 Botanicals, LLC, its individual owners, and all related
23 subsidiaries or related entities, including but not
24 limited to CBD American Shaman, LLC."
25     Do you see that, ma'am?

Page 19

1      A. Yes.
2      Q. Have you seen this document before?
3      A. I don't recall. Probably.
4      Q. Okay. You would agree with me that at least on
5  this document that it indicates that the agreement is
6  made between Ms. Pina and Shaman Botanicals, correct?
7          MR. PORTO: I will object to the form of
8  the question.
9      Q. (BY MR. STALLWORTH) You can answer, ma'am.
10     A. Correct.
11     Q. Who is CBD American Shaman?
12     A. That's another company that Vince Sanders owns.
13     Q. Okay. How is CBD American Shaman related to
14 Shaman Botanicals, LLC?
15     A. CBD American Shaman is our brand name, so the
16 products that Shaman Botanicals makes, the labels say CBD
17 American Shaman.
18         And we also have a corporate source around the
19 country under that entity.
20     Q. Okay. So Shaman Botanicals manufactures the
21 product, but it may be branded or labeled as CBD American
22 Shaman; is that fair?
23     A. Correct.
24     Q. And then on top of the products being labeled as
25 CBD American Shaman, they may further have locations

Page 20

1  labeled as CBD American Shaman; is that correct?
2      A. Correct.
3      Q. How many employees does CBD American Shaman
4  have?
5      A. Right now, we have about a hundred.
6      Q. Okay. Do you know why this agreement would
7  simply list Shaman Botanicals, LLC, and CBD American
8  Shaman, LLC, as part of the severance agreement but not
9  American Shaman Franchise Systems, Inc.?
10         MR. PORTO: I will object to the form of
11 the question. Go ahead and answer.
12     A. I don't know. I am not aware.
13     Q. (BY MR. STALLWORTH) Okay. Pulling up what's
14 called a Notice of Right to Sue. Have you seen this,
15 ma'am?
16     A. I believe I saw it, yes.
17     Q. All right. Are you familiar with what this is?
18     A. Not really, no.
19     Q. Okay. This is just a document from the Missouri
20 Commission on Human Rights indicating that Ms. Pina has
21 the ability to pursue a lawsuit against Shaman
22 Botanicals, LLC. I am going to scroll down. Okay.
23         And you will see at the bottom, it indicates
24 your counsel, Mr. Porto, correct?
25     A. Correct.

5 (Pages 17 to 20)
Case 4:21-cv-00772-WBG   Document 36-2   Filed 11/02/22   Page 5 of 15
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

**Page 21**

Q. Okay. Are you aware of whether or not Shaman Botanicals ever filed any document with the Missouri Commission on Human Rights indicating that it was not the proper legal entity with respect to Ms. Pina's Charge of Discrimination against it?

A. I am not aware of any of that, no.

Q. Okay. You have no knowledge of that, correct?

A. Correct.

Q. Who did you speak with in preparation for the deposition today?

A. My attorney, Nick Porto.

Q. Anyone else?

A. No.

Q. What documents did you review in preparation for the deposition today?

A. I reviewed the -- I don't know the terms.

MR. PORTO: Just for the record, Ms. Geither has got a folder on her lap here that you would be seeing if you were in person that has the documents that she reviewed.

Q. Okay.

A. So I reviewed Exhibit A. Do you want me to list them off?

Q. No, ma'am, that is fine. I was curious if you remembered what you had reviewed.

**Page 22**

Did you speak with Mr. Sanders in preparation for your deposition today?

A. I did not, no.

Q. Did you speak with Mr. Saylor in preparation for your deposition today?

A. I did not, no.

Q. Is Mr. Saylor still employed by -- well, let me ask you this. Who is Mr. Saylor employed by?

A. He's employed by American Shaman Franchise Systems.

Q. Is he employed by Shaman Botanicals, LLC?

A. No.

Q. Who are you employed by?

A. I am employed by Shaman Botanicals, LLC.

Q. Okay. All right. Are you employed by American Shaman Franchise Systems, Inc.?

A. I am not employed by them, no.

Q. But you are providing the deposition today on that entity's behalf, correct?

A. Correct.

Q. And what is your, meaning Ms. Geither's current role with the company?

A. I am the CFO.

Q. What does that stand for, ma'am?

A. Chief financial officer.

**Page 23**

Q. How long have you been in that position?

A. Four years.

Q. Were you with Shaman Botanicals, LLC, before that?

A. Before the four years?

Q. Yes, ma'am.

A. No.

Q. Do you have any experience in Human Resources?

A. I have some, yes.

Q. What experience do you have?

A. Interviewing people, hiring people, terminating people.

Q. Have you -- I'm sorry. Go ahead.

A. That's okay. Go ahead.

Q. Have you performed investigations related to discrimination, harassment or retaliation?

A. I didn't really perform any, no.

Q. Let me ask you, does American Shaman Franchise Systems, Inc. provide training related to discrimination, harassment or retaliation?

A. We don't really have training.

Q. So no, American Shaman Franchise Systems, Inc. does not provide training related to discrimination, harassment or retaliation in the workplace, correct?

A. Correct.

**Page 24**

Q. Does Shaman Botanicals, LLC, provide training related to discrimination, harassment or retaliation in the workplace?

A. No.

Q. Does American Shaman Franchise Systems, Inc. have an HR manager?

A. Yes.

Q. Who is that?

A. Currently?

Q. At the time of Ms. Pina's termination in February of 2020.

A. It was Luke Mancillas.

Q. Okay. Does Shaman Botanicals, LLC, have an HR manager?

A. At the time it was Luke Mancillas.

Q. So Mr. Mancillas was the HR manager for American Shaman Franchise Systems, Inc. as well as Shaman Botanicals, LLC, correct?

A. Correct.

Q. So if an employee complained of discrimination, harassment or retaliation in the workplace, who would perform the investigation related to complaints of discrimination, harassment or retaliation in the workplace?

A. Luke Mancillas would have, our HR manager.

Page 29

1　not be treated differently because they make good faith
2　complaints of discrimination, harassment or retaliation?
3　　A. Yes.
4　　Q. Now, the next heading on -- or rather, two
5　headings down that says 1-3, "Management Access and
6　Communication."
7　　　Do you see that?
8　　A. I do.
9　　Q. The first sentence reads, "All American Shaman
10　Franchise Systems, Inc. employees have full and equal
11　access to speak with management on all matters regarding
12　their employment."
13　　　Do you see that?
14　　A. I do.
15　　Q. Does this statement indicate that employees
16　should have access to speak with management regarding any
17　issues they may have with their employment?
18　　A. Yes.
19　　Q. On the next page of this Employee Handbook that
20　has a Bates level of 08. And it says, "1-6, Reporting
21　Employee Concerns."
22　　　Do you see that?
23　　A. I do.
24　　Q. It indicates, "All employees of American Shaman
25　Franchise Systems, Inc. are expected to communicate any

Page 30

1　workplace issues or concerns first to their supervisor at
2　any time for immediate attention."
3　　　Do you see that?
4　　A. I do.
5　　Q. And then it goes on to say, "In the event the
6　issue cannot be resolved with your supervisor or if such
7　person is an inappropriate person to resolve the concern,
8　you should communicate your concerns to the chief
9　operating officer or to the chief executive officer."
10　　　Do you see that?
11　　A. I do.
12　　Q. It goes on to say, "You may submit a report
13　verbally or in writing and may even submit such report
14　anonymously if you choose. Reporting violations of any
15　policy are to be reported in the same manner described
16　herein, unless otherwise designated."
17　　　Do you see that, ma'am?
18　　A. I do.
19　　Q. Do you have any reason to dispute the accuracy
20　of the statements with respect to employees reporting
21　concerns in the workplace?
22　　A. No.
23　　Q. Okay. The next paragraph goes on to say that,
24　"Employees that report any issue, concern, or violation
25　in good faith will not be retaliated against."

Page 31

1　　　Do you see that?
2　　A. I do.
3　　Q. And that's similar to what we read above where
4　it indicates that the employee should not be retaliated
5　against for bringing concerns of -- or rather any
6　concerns they may have to management, correct?
7　　A. Correct.
8　　Q. The third paragraph under 1-6 indicates that,
9　"It is always the policy of American Shaman Franchise
10　Systems, Inc. that all employee issues and concerns be
11　treated with respect and dignity."
12　　　Do you see that?
13　　A. I do.
14　　Q. Have you always understood that to be a true and
15　accurate statement?
16　　A. Yes.
17　　Q. It goes on to say, "Management will take every
18　effort to resolve matters in a timely and confidential
19　manner."
20　　　Do you see that?
21　　A. I do.
22　　Q. Does that mean that management will take the
23　complaints of the employee seriously?
24　　A. Yes.
25　　Q. Does that mean that management will engage in an

Page 32

1　investigation related to the employee's complaints?
2　　　MR. PORTO: Objection to the form of the
3　question.
4　　　Go ahead and answer if you know.
5　　A. Yes.
6　　Q. (BY MR. STALLWORTH) Yes, that management will
7　investigate the employee's complaints, ma'am?
8　　　MR. PORTO: Same objection. Vague as to
9　the speculative nature of the complaint.
10　　　MR. STALLWORTH: Fair enough.
11　　Q. (BY MR. STALLWORTH) Ma'am, it says, "Management
12　will take every effort to resolve matters in a timely and
13　confidential manner."
14　　　Do you see that?
15　　A. I do.
16　　Q. How would management attempt to resolve employee
17　complaints in a timely and confidential manner?
18　　　MR. PORTO: Same objection. Vague as to
19　the nature of the complaints. Misstates the -- go ahead,
20　if you know.
21　　A. Can you repeat the question?
22　　Q. (BY MR. STALLWORTH) Yes, ma'am. This sentence
23　says, "Management will take every effort to resolve
24　matters in a timely and confidential manner."
25　　　Do you see that?

Page 33

1   A. I do.
2   Q. I am just trying to understand, what will
3  management do to resolve matters in a timely and
4  confidential manner?
5   A. So investigate what's happened and keep it
6  confidential.
7   Q. Okay. So it will perform an investigation; is
8  that right?
9   A. Correct.
10  Q. Okay. What is involved with performing an
11 investigation?
12  A. Obviously, talking to the person who feels they
13 have been mistreated. And then talk to other people
14 confidentially, not bringing up anyone's name.
15  Q. So you indicated for an investigation you might
16 talk to the complainant, correct?
17  A. Correct.
18  Q. You might also want to talk to any relevant
19 witnesses, correct?
20  A. Correct.
21  Q. You might want to review any documents that
22 might be relevant to the investigation, correct?
23  A. Correct.
24  Q. And you would want to do that to make sure that
25 you're performing a thorough investigation, correct?

Page 34

1   A. Correct.
2   Q. And that's important because the company wants
3  to make sure it's taking employees' concerns or
4  complaints seriously, correct?
5   A. Correct.
6   Q. The last sentence of this third paragraph under
7  1-6 indicates that, "Any questions regarding who the
8  appropriate person is to handle any policy issue or
9  concern shall be directed to the HR administrator."
10    Do you see that?
11  A. Yes.
12  Q. In this instance, the HR administrator for
13 American Shaman Franchise Systems, Inc. or Shaman
14 Botanicals, LLC, that would be Luke Mancillas, correct?
15  A. Correct.
16  Q. I am now on page 11 of the Employee Handbook
17 with a Bates label of 015. And there is a heading that
18 says 2-6, "Harassment and Coercion Free Workplace
19 Policy."
20    Do you see that, ma'am?
21  A. I do.
22  Q. Could you read the first paragraph for me,
23 please?
24  A. "The company maintains a respectful, safe,
25 productive atmosphere and is committed to maintaining a

Page 35

1  workplace that is free from any form of coercion or
2  harassment because of race, color, religion, gender,
3  national origin, ancestry, disability, age, genetic
4  information, sexual orientation, gender identity, veteran
5  status, and any other characteristic protected by
6  applicable law. Coercion or harassment of the company's
7  employees by an employee or non-employee personnel,
8  including clients, vendors, and suppliers, is a violation
9  of the company's policy and is prohibited."
10  Q. Have you always understood that to be a true and
11 accurate statement?
12  A. Yes.
13  Q. And then there is a heading that says, "What is
14 Harassment?"
15    Do you see that?
16  A. I do.
17  Q. It talks about, "Harassment can take many forms
18 and is not necessarily sexual in nature."
19    Do you see that?
20  A. Yes.
21  Q. Could you read the remaining part of that
22 paragraph for me?
23  A. "Harassment may consist of any kind of unwelcome
24 conduct or communication which is based on an
25 individual's protected status, such as sex, race, color,

Page 36

1  ancestry, national origin, religion, age, physical or
2  mental disability, or any other protected group status,
3  and that results in a tangible employment action or that
4  is severe or pervasive enough that it creates an
5  intimidating, coercive, hostile or offensive working
6  environment. Forms of harassment include but are not
7  limited to bullying, name calling, derogatory jokes,
8  language or curses related to a protected status, and
9  similar types of conduct that have the purpose or effect
10 of creating an intimidating, hostile, or offensive
11 working environment."
12  Q. Have you always understood that to be a true and
13 accurate statement regarding what is harassment?
14  A. Yes.
15  Q. And that would include identifying harassment as
16 bullying, name calling, derogatory jokes and things of
17 that nature, correct?
18  A. Correct.
19  Q. And again, the company wants to make sure that
20 it's treating all employees' complaints of discrimination
21 and harassment seriously, correct?
22  A. Correct.
23  Q. And then with respect to reporting, it talks
24 again about reporting any issues or instance of
25 harassment to the Human Resources Department, correct?

9 (Pages 33 to 36)
Case 4:21-cv-00772-WBG  Document 36-2  Filed 11/02/22  Page 8 of 15
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

## Page 37

1  A. Correct.
2  Q. And then under the heading for Reporting, which
3  is on page 12 of the Employee Handbook with a Bates label
4  of 016, it then goes on to talk about the fact that "any
5  supervisor or manager who becomes aware of possible
6  unlawful harassment must immediately advise the Human
7  Resources Department," correct?
8  A. Correct.
9  Q. So that it can be investigated in a timely and
10 confidential manner, correct?
11 A. Correct.
12 Q. It goes on to indicate that, "All reports will
13 be promptly investigated with due regard for the privacy
14 of everyone involved."
15     Right? Do you see that?
16 A. Yes.
17 Q. Have you always understood that to be a true and
18 accurate statement?
19 A. Yes.
20 Q. It goes on to say that, "Retaliation against any
21 individual who makes a good faith complaint or provides
22 any information regarding harassment, including
23 participation in a harassment investigation, will not be
24 tolerated."
25     Do you see that, ma'am?

## Page 38

1  A. I do.
2  Q. Have you always understood that to be a true and
3  accurate statement?
4  A. Yes.
5  Q. And that's important because the company should
6  not be terminating individuals because they made good
7  faith complaints, correct?
8  A. Correct.
9  Q. It goes on to say, "Any individual who engages
10 in retaliation is in violation of this policy and will be
11 disciplined accordingly, up to the including
12 termination."
13     Do you see that?
14 A. Yes.
15 Q. Have you always understood that to be a true and
16 accurate statement?
17 A. Yes.
18 Q. And then it talks about discipline and it says,
19 "Any employee found to have engaged in sexual or other
20 harassment will be subject to disciplinary action, which
21 may include termination of employment."
22     Do you see that?
23 A. Yes.
24 Q. Have you always understood that to be a true and
25 accurate statement?

## Page 39

1  A. Yes.
2  Q. And then the last paragraph, or rather the
3  second paragraph underneath the heading Discipline talks
4  about the fact that "Harassment may encompass a wide
5  range of verbal, physical and visual behaviors and may be
6  sexual or non-sexual in nature." It depends on a number
7  of factors, correct?
8  A. Correct.
9  Q. You have always understood that to be a true and
10 accurate statement, right?
11 A. Yes.
12 Q. Now, it is my understanding that Ms. Pina had
13 worked for an affiliate of Shaman Botanicals or American
14 Shaman Franchise Systems, Inc. prior to moving to the KC
15 location in around January 2020. Do you have any
16 knowledge of that?
17 A. Yes.
18 Q. What's your understanding of Ms. Pina's previous
19 employment?
20 **A. She worked for CBD American Shaman at our**
21 **corporate store in Boston, Massachusetts.**
22 Q. Do you know what Ms. Pina's role was with CBD
23 American Shaman in Boston?
24 **A. She was a sales associate.**
25 Q. Do you know how long she was employed with CBD

## Page 40

1  American Shaman in Boston?
2  **A. I believe it was in probably 2019 till she moved**
3  **here.**
4  Q. Okay. So you might say at least maybe 12 months
5  prior to moving to the KC area?
6  **A. I believe so, I would have to look it up to**
7  **verify that, though.**
8  Q. Okay. Are you aware of whether or not Ms. Pina
9  had any complaints of any sort made against her while she
10 was employed at CBD American Shaman?
11 **A. Not that I'm aware of.**
12 Q. You are not aware of any complaints that
13 Ms. Pina would have had related to her employee
14 performance while employed at CBD American Shaman,
15 correct?
16     MR. PORTO: I will just object to the
17 extent it is beyond the scope of the topics for
18 examination of the corporate representative notice of
19 deposition for today.
20     Go ahead and answer.
21 A. Correct.
22 Q. (BY MR. STALLWORTH) Correct, you don't know,
23 correct?
24 **A. Correct, I don't know.**
25 Q. Do you know what were the circumstances that led

**41**

1  to Ms. Pina being hired by American Shaman Franchise
2  Systems, Inc.?
3        MR PORTO: I'll -- go ahead.
4    A. Can you repeat the question? Sorry.
5    Q. (BY MR. STALLWORTH) Sure. It is my
6  understanding, and you have testified that Ms. Pina
7  previously worked for CBD American Shaman at the Boston
8  corporate location, correct?
9    A. Correct.
10   Q. And of course we have identified that she worked
11 for American Shaman Franchise Systems, Inc., correct?
12   A. Correct.
13   Q. So I am just asking you, do you know what were
14 the circumstances that brought her to the KC location?
15   A. It was my understanding that she was moving back
16 here anyway and that she heard we had an opening for our
17 SCO, social medial marketing person, and she applied for
18 the position and was interviewed.
19   Q. Do you know who interviewed her?
20   A. I believe it was Marc Saylor and Luke Mancillas.
21   Q. I'm sorry, who was the last person you
22 mentioned?
23   A. Luke Mancillas.
24   Q. And we already discussed the last page of this
25 Employee Handbook is dated January 2nd, 2020. Do you see

**42**

1  that, ma'am?
2    A. Yes.
3    Q. Do you know if Ms. Pina had started her
4  employment prior to that date?
5        MR. PORTO: I will object to the form of
6  the question. It is vague as to what entity you're
7  referring to.
8    Q. (BY MR. STALLWORTH) Do you know if she started
9  her employment with American Shaman Franchise Systems,
10 Inc. prior to that date?
11   A. I don't believe so, I believe she started the
12 first of the year of 2020.
13   Q. Okay. Now, are you aware of complaints that
14 would have been made by Thomas Miley (sic), in and around
15 January 2020?
16   A. No, I am not aware of any.
17   Q. Let me be more specific. Are you aware of any
18 complaints of racial discrimination that would have been
19 made by Thomas Miley (sic) in or around January 2020?
20       MR. PORTO: I will object to the form of
21 the question. Go ahead and answer, if you know.
22   A. I am not aware of it. He didn't come to me.
23   Q. (BY MR. STALLWORTH) Are you aware that
24 Mr. Miley felt racially discriminated against by his
25 supervisor, Kathi Miley?

**43**

1    A. No.
2    Q. I may have said those names wrong.
3        MR. PORTO: I think you referred to Mr.
4  Miley. I think you said Mr. Miley instead of Ms. Miley.
5        MR. STALLWORTH: I think that's correct.
6    Q. (BY MR. STALLWORTH) Do you know who Mr. Miley
7  is?
8        MR. PORTO: I think you are meaning to
9  say, do you know who Mr. Miles is?
10   Q. (BY MR. STALLWORTH) Miles, excuse me. Thomas
11 Miles I think is his name. Do you know who Thomas Miles
12 is?
13   A. I do.
14   Q. Okay. Excuse me with that.
15       Let's go through this again real quick, since I
16 am having difficulty with my word usage today, if you
17 don't mind.
18       Are you aware of any complaints of racial
19 discrimination by Thomas Miles in around January 2020?
20   A. No.
21   Q. Are you aware of any complaints by Mr. Miles in
22 around January 2020?
23   A. No.
24   Q. Are you aware of who Mr. Miles' supervisor was
25 in around January 2020?

**44**

1    A. Yes.
2    Q. Who was that?
3    A. Marc Saylor.
4    Q. Was there an individual named Kathi who was also
5  his supervisor?
6        MR. PORTO: I will object to the form of
7  the questions regarding Mr. Miles -- for today's
8  deposition. Go ahead and answer if you know.
9    A. I didn't think she was his supervisor, no.
10   Q. Do you know who she is?
11   A. Yes.
12   Q. What is her last name, ma'am?
13   A. Miley.
14   Q. Okay. Do you recall what was her role with the
15 company?
16   A. She's an -- like an admin. She takes care of
17 all -- she works mainly with the franchisees.
18   Q. And do you recall what was Thomas Miles' role
19 with the company?
20   A. He was in sales.
21   Q. Okay. Sharing what's been marked as Plaintiff's
22 Exhibit 5. Have you seen this document before, ma'am?
23   A. I have not.
24   Q. I am going to represent to you that this is a
25 text exchange between Mr. Miles and Ms. Miley. Do you

11 (Pages 41 to 44)
Case 4:21-cv-00772-WBG   Document 36-2   Filed 11/02/22   Page 10 of 15
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

## Page 45

see this?

A. I see it.

Q. Okay. And it indicates in at least the meme that IS presented on this page it says, "What's black and never works?"

And then there is a question mark. And at the bottom it says, "Decaffeinated coffee you racist bastard".

Do you see that?

A. I do.

Q. And I believe you indicated a moment ago that you had no knowledge of complaints from Mr. Miles as it relates to this meme that was sent to him from Ms. Miley, correct?

MR. PORTO: Shaun, I am going to object again, and if I can just have a continuing objection as to any questions regarding Mr. Miles, not outlined in the topics for examination for today's deposition.

Q. (BY MR. STALLWORTH) Okay. You can answer, ma'am.

A. Yes, correct. I never saw this or knew about it.

Q. Are you aware of whether or not Mr. Miles' complaints were ever investigated?

MR. PORTO: Shaun, I don't mean to

## Page 46

interrupt again, but did you agree to my continuing objection regarding questions regarding Mr. Miles?

MR. STALLWORTH: Sure.

MR. PORTO: Go ahead.

A. Can you repeat the question?

Q. (BY MR. STALLWORTH) Sure. Do you know if Mr. Miles' complaints were ever investigated?

A. I never got any complaints from him.

Q. Do you know if Mr. Mancillas ever investigated Mr. Miles' complaints?

A. No, I don't know.

Q. This is a question for you as the CFO of the company. So this may be in your personal knowledge, but would you find this particular meme that was sent from one employee to another employee, would you find this offensive?

MR. PORTO: I will object to the form of the question.

A. I mean, I don't know how it was sent. I don't know what the rest of the text was.

Q. That's fair. Without knowing the context, could you see how it could be considered offensive to people?

A. Sure.

Q. Are you aware of any complaints of discriminatory practices as it relates to Juanita

## Page 47

Thedford?

A. No.

Q. Do you know who Ms. Thedford is?

A. Yes.

MR. PORTO: May I have a continuing objection with questions regarding Ms. Thedford?

MR. STALLWORTH: Of course.

Q. (BY MR. STALLWORTH) Do you know who Ms. Thedford is?

A. Yes.

Q. Who is Ms. Thedford?

A. She worked in -- like also the Marketing Department, franchise.

Q. Okay. And so was she -- so she was doing marketing so to speak; is that right?

A. Yeah, I don't know exactly what her role was. But I know she helped Marc with marketing things.

Q. Okay. Are you aware of any complaints that Ms. Thedford made with respect to unequal pay among employees of color?

A. I am not aware of that, no.

Q. Are you aware of whether or not any of Ms. Thedford's complaints were investigated?

A. I am not aware.

Q. Are you aware of whether or not Mr. Mancillas

## Page 48

ever investigated any complaints related to discriminatory pay practices that were made by Ms. Thedford?

A. No, I am not aware.

Q. Are you aware Ms. Pina had complained to Mr. Mancillas regarding the complaints made by Mr. Miley and Ms. Thedford?

A. No. I don't recall that.

Q. And I believe you already indicated that you are not aware of any investigations as it related to Ms. Thedford or Mr. Miles' complaints in around January 2020, correct?

A. Correct.

Q. Are you aware that Ms. Pina also made complaints to Alex Rhoades, the creative director?

A. No, I am not aware of that at all.

Q. Do you know who Mr. Rhoades is?

A. Yes.

Q. Is Mr. Rhoades still employed with the company?

A. Yes. And it is a she.

Q. Excuse me. So Ms. Rhoades is still employed with the company?

A. Yes.

Q. Are you aware that Ms. Pina made complaints to Joel Mackey?

Page 53

1  Q. Okay. Who would have negotiated his commission
2  structure?
3  A. It would have been Marc Saylor or by Miley at
4  the time, president of the franchise.
5  Q. Okay. And you say Miley meaning Kathi Miley?
6  A. No. Meaning Raymond, Bud Miley, different
7  Miley.
8  Q. Okay. So last name was Miley as well?
9  A. Correct.
10 Q. Were they related?
11 A. Yes.
12 Q. Okay. And so did you have any knowledge that
13 Mr. Torres planned to contact the U.S. Department of
14 Labor based upon his concerns of discrimination and
15 unequal pay?
16         MR. PORTO: I will object to the form
17 of the question.
18 A. No, I had no idea he was going to do that or --
19 Q. (BY MR. STALLWORTH) Did you have knowledge
20 that -- sorry, go ahead.
21 A. I didn't know that he talked about it.
22 Q. Did you have knowledge that Mr. Torres indeed
23 contacted the U.S. Department of Labor regarding his
24 concerns of discrimination and unequal pay?
25 A. Not until we got a notice.

Page 54

1  Q. When did you get the notice?
2      MR. PORTO: I will object to the form of the
3  question. Same objection as before. This is not
4  outlined in the topics for examination. There's nothing
5  referencing Mr. Torres, there's nothing referencing this
6  topic matter.
7      If you know, go ahead and answer.
8  A. I don't remember.
9  Q. (BY MR. STALLWORTH) Would it have been in 2020?
10 A. Probably.
11 Q. Okay. Did you see the notice from the U.S.
12 Department of Labor related to Mr. Torres' concerns of
13 discrimination and unequal pay?
14 A. I don't remember seeing it. Just heard about
15 it.
16 Q. Okay. Who did you hear about it from?
17 A. Nick maybe. I don't really remember.
18 Q. Who is Nick?
19 A. Oh, Nick Porto.
20     MR. PORTO: I am Nick.
21     MR. STALLWORTH: I didn't know. When you
22 went here (indicating).
23     MR. PORTO: This guy here.
24 Q. (BY MR. STALLWORTH) You can literally reach out
25 and touch him. All right.

Page 55

1       Well, tell me this. Are you aware that
2  Mr. Torres had asked Ms. Pina to sign a petition related
3  to his complaints of discrimination and unequal pay?
4  A. No. I wasn't aware of that at all.
5  Q. Are you aware that Ms. Pina agreed to sign the
6  petition related to complaints --
7  A. No.
8  Q. Let me finish the question real quick.
9  A. Sorry.
10 Q. That's okay. -- related to complaints of
11 discrimination and unequal pay?
12 A. No, I was not aware of that.
13 Q. Are you aware of whether or not there was any
14 investigation related to Mr. Torres' complaints of
15 discrimination and unequal pay?
16 A. I don't know what there was to investigate,
17 except that he was on a different pay structure and that
18 is what he was told.
19 Q. Okay. I understand that that is your reasoning.
20 I am asking you, was there any investigation?
21 A. If he told Luke, Luke would have asked his
22 supervisors what the pay structure was. But I was not
23 involved in any investigation, no.
24 Q. As we sit here today, is there any documentation
25 that the company has related to any investigation of

Page 56

1  Mr. Torres' complaints of discrimination as it relates to
2  unequal pay?
3      MR. PORTO: I will object to the form of
4  the question, to the extent it exceeds the scope of the
5  topics for examination and also invades the
6  attorney-client work product privilege.
7      Go ahead and answer if you know.
8  A. No, I am not aware.
9  Q. (BY MR. STALLWORTH) It is my understanding that
10 there was a staff meeting in or around February 10th of
11 2020. Do you recall that meeting?
12 A. Yes.
13 Q. Do you recall who was in the meeting?
14 A. Yes.
15 Q. Who was in the meeting?
16 A. It was Luke Mancillas, Sage Pina, Tom Miles,
17 Juanita Thedford. I think Abraham Torres was there. I
18 don't recall. Sky Fisher was there, Corie Windholz, and
19 Olivia O'Dell. I was not in the meeting.
20 Q. I'm sorry. What was that?
21 A. I was not in the meeting.
22 Q. So you did not attend the meeting, is your
23 testimony?
24 A. I did not attend the meeting.
25 Q. What is your understanding of the purpose of the

14 (Pages 53 to 56)
Case 4:21-cv-00772-WBG   Document 36-2   Filed 11/02/22   Page 12 of 15
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

Page 57

1 meeting?
2   A.  The purpose was -- to my knowledge, Luke told me
3 that they wanted -- all the staff wanted to get together
4 and just discuss really the work culture of American
5 Shaman Franchise is my understanding.
6   Q.  Okay.  And what did he mean by "work culture"?
7   A.  I think some of the employees were not happy
8 with just the negativity that might have been going on in
9 the office, and they wanted to discuss it.
10  Q.  What negativity was that?
11  A.  That I don't know.  I didn't ask what negativity
12 they were referring to.
13  Q.  All right.  Are you aware that at that meeting
14 Ms. Pina brought up the complaints of discrimination
15 by -- or at least discrimination and/or harassment by
16 Mr. Miles [sic]?
17  A.  No, I'm not aware of that.
18  Q.  Are you aware that at that February 10th, 2020
19 meeting that Ms. Pina brought up the complaints of
20 Ms. Thedford as they relate to discrimination and unequal
21 pay?
22  A.  No, not aware.
23  Q.  Are you aware that at that February 10th, 2020
24 meeting Ms. Pina brought up the complaints of
25 discrimination and unequal pay by Mr. Torres?

Page 58

1   A.  No, not aware.
2   Q.  Are you aware of whether or not Mr. Saylor was
3 at that meeting?
4   A.  He was not.
5   Q.  Are you aware that individuals at that meeting
6 indicated that they did not feel that they could bring
7 their complaint to Mr. Saylor?
8   A.  No, I was not aware of that.
9   Q.  Are you aware that individuals at that meeting
10 indicated they were too nervous to bring their issues to
11 their direct supervisor because they had already brought
12 those issues to the supervisor and they felt as though
13 the issues were being dismissed?
14  A.  No, I wasn't aware.
15  Q.  Are you aware that at the February 10th, 2020
16 meeting that employees demanded a meeting with the CEO,
17 Mr. Sanders, once the Vegas trip ended?
18  A.  So I came into the meeting after it was almost
19 over.  Luke asked me to come in.  And that's when they
20 asked if they could talk to Vince Sanders.
21  Q.  I just want to make sure I am clear.  First you
22 said you didn't attend the meeting.  But you're saying
23 you came in on the back end, so to speak?
24  A.  I was just walking by.  Luke asked me to step
25 in.  I stepped in.  And Luke said they wanted to have a

Page 59

1 meeting with Vince.  That is the only part I saw of the
2 meeting.
3       And I told them I would try and get it set up
4 with Vince.
5   Q.  Okay.  So I just want to be clear.  You're
6 saying that you don't know how long the meeting was
7 there.  You're indicating that you stepped in on,
8 quote/unquote, the back end of the meeting?
9   A.  Correct.
10  Q.  Do you know how long the employees were meeting
11 before you entered the meeting?
12  A.  I don't.
13  Q.  Do you know how long the employees were meeting
14 after you exited the meeting?
15  A.  I am pretty sure after I left the meeting they
16 left.
17  Q.  And in that meeting, the employees indicated
18 they wanted to have a meeting with the CEO; is that
19 correct?
20  A.  Correct.
21  Q.  Who made that request to you?
22  A.  I don't remember off the top of my head.
23  Q.  Do you recall that Ms. Pina had indicated that
24 she wanted to have a meeting with her and the rest of the
25 employees with the CEO?

Page 60

1   A.  It could have been her or it could have been
2 Olivia O'Dell.  I don't remember.
3   Q.  Okay.  You have no reason to dispute that
4 Ms. Pina could have indicated to you that she wanted to
5 have a meeting with Mr. Sanders to discuss the employees'
6 complaints?
7   A.  Could have been.  I don't remember.
8   Q.  Okay.  Are you aware of whether or not there was
9 any investigation with respect to the matters that were
10 brought up during the February 10th, 2020 meeting?
11      MR. PORTO:  Can you repeat the question,
12 Shaun?  I'm sorry.
13  Q.  (BY MR. STALLWORTH)  Sure.  Are you aware of
14 whether or not there was any investigation with respect
15 to the matters that were brought up at the February 10th,
16 2020 meeting by the employees that attended the meeting?
17  A.  I don't believe there was an investigation
18 because I believe what I asked everybody was to write
19 down -- sit down and write their complaints so I could
20 take them to Vince.
21  Q.  Okay.  And so when did you say that?
22  A.  Before I left the meeting that day.
23  Q.  All right.  So I just want to add on to this.
24 So you entered the meeting.
25  A.  Yeah.

15 (Pages 57 to 60)
Case 4:21-cv-00772-WBG   Document 36-2   Filed 11/02/22   Page 13 of 15
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

### Page 61

1  Q. An individual indicated at some point that they
2  wanted a meeting with the CEO, correct?
3  A. Correct.
4  Q. You indicated that you would try and set that
5  up, correct?
6  A. Correct.
7  Q. And then now you are saying you also indicated
8  that you wanted them to write it down?
9  A. Right. So I could take their complaints to
10 Vince.
11 Q. Who did you say that to?
12 A. The whole room.
13 Q. All right. And so you indicated -- I believe
14 you indicated that -- well, let me back up.
15    It appears to be that you're indicating that you
16 never received any written complaints; is that right?
17 A. That's true. Nobody ever gave me a written
18 complaint.
19 Q. Okay.
20 A. Nobody followed through and gave me anything.
21    MR. PORTO: Shaun, I don't know how much
22 longer you have, but sometime maybe just a two-minute
23 break?
24    MR. STALLWORTH: If you give me one or two
25 more minutes, it would be a good spot to take a break and

### Page 62

1  I won't have too much left after that.
2     MR. PORTO: Sure.
3  Q. (BY MR. STALLWORTH) So I am pulling back up the
4  Employee Handbook that was Exhibit 1. Do you see this?
5  A. Yes.
6  Q. All right. This is on page 4 of the Employee
7  Handbook with a Bates level of 08. Now, we talked about
8  this a little earlier. You see in the first paragraph it
9  talks about, "Reporting Employee Concerns" under 1-6.
10    Do you see that?
11 A. Yes.
12 Q. And in the second to the last sentence it talks
13 about the fact that -- do you see this right here, "You
14 may submit a report verbally or in writing."
15    Do you see that?
16 A. Yes.
17 Q. Okay. So employees were or would be within
18 their rights just to make complaints verbally, correct?
19 They don't have to submit the complaint in writing under
20 the policy, correct?
21 A. They don't have to. But because they all wanted
22 to talk to Vince, I thought it would be easier if I had
23 the stuff in writing to show him.
24 Q. Okay. But one, just to be clear, under the
25 policy they don't have to do it in writing, correct?

### Page 63

1  A. They don't have to, according to the policy.
2  Q. And you have indicated that that may have just
3  been something that you wanted to have to provide to
4  Mr. Sanders before the meeting?
5  A. Sure.
6  Q. But the employees certainly could have made
7  those complaints directly to Mr. Sanders in the meeting,
8  correct?
9  A. They could have.
10 Q. Okay. And so the fact that you may not have
11 received anything in writing, are you saying that's what
12 necessarily precluded you from setting up a meeting with
13 Mr. Sanders?
14 A. No.
15 Q. Okay. Was a meeting with Mr. Sanders ever set
16 up?
17 A. No. I mean I talked to Vince about it. But we
18 never got -- he never got it worked into his schedule.
19 Q. Why not?
20 A. I don't know. You would have to ask Vince.
21 Q. Okay. Did Mr. Sanders ever -- excuse me. Did
22 Mr. Saylor ever have any further conversations about
23 setting up a meeting with Mr. Sanders regarding employee
24 complaints or concerns?
25 A. Not to my knowledge.

### Page 64

1  Q. Did Mr. Mancillas have any further conversations
2  with Mr. Sanders regarding employee complaints or
3  concerns?
4  A. Not that I'm aware of.
5  Q. Okay. Do you recall any statement being made by
6  you or Mr. Mancillas that Ms. Pina would receive a
7  meeting with the CEO on the first day back after the
8  Vegas trip?
9  A. I never said that. I don't recall saying that.
10 Q. Okay. And you have no knowledge of whether or
11 not Mr. Saylor may have made a statement such as that,
12 correct?
13 A. No. I have no knowledge of that.
14    MR. STALLWORTH: Why don't we take a break
15 and I won't have much left. Say maybe five minutes or
16 so.
17    MR. PORTO: Okay.
18    MR. STALLWORTH: All right. Thank you.
19    (Off the record at 11:00 a.m. until
20 11:30.)
21    MR. STALLWORTH: We are back on the
22 record.
23 Q. (BY MR. STALLWORTH) Now, Ms. Geither, earlier
24 you indicated that Ms. Pina was terminated as a result of
25 a -- I guess I would term it a performance issue. Is

16 (Pages 61 to 64)
Case 4:21-cv-00772-WBG   Document 36-2   Filed 11/02/22   Page 14 of 15
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

Page 65

1  that fair to say?
2     A. Yes.
3     Q. Are you aware of whether or not there was an
4  outline for the presentation that she was supposed to
5  present in Vegas?
6     A. I am not aware.
7     Q. Are you aware of any instructions that
8  Mr. Saylor may have provided to Ms. Pina with respect to
9  what the contents of what the presentation should
10 include?
11    A. No, I'm not aware.
12    Q. And further, you are not aware of any outlines
13 that Mr. Saylor may have provided to Ms. Pina in writing,
14 correct?
15    A. Correct.
16    Q. And earlier we talked about deadlines for the
17 presentation, correct?
18    A. Correct.
19    Q. And you're unaware of any deadlines that
20 Mr. Saylor may have provided to Ms. Pina with respect to
21 the presentation being complete, correct?
22         MR. PORTO: I will object to the form of
23 the question, misstates her prior testimony.
24    Q. (BY MR. STALLWORTH) Do you understand the
25 question, ma'am?

Page 66

1     A. Yes. I am not aware of any.
2     Q. Are you aware of whether or not Mr. Saylor
3  engaged in any disciplinary action against Ms. Pina for
4  not providing the presentation to her prior to the Vegas
5  trip?
6          MR. PORTO: I will object to the form of
7  the question as vague and compound.
8     Q. (BY MR. STALLWORTH) All right. That's fair.
9     I understand that the Vegas trip occurred
10 sometime in early February, correct?
11    A. Correct.
12    Q. All right. Are you aware of whether or not
13 Mr. Saylor disciplined Ms. Pina for not providing the
14 presentation to him let's say 10 days before the trip?
15    A. I am not aware.
16    Q. Are you aware of whether or not Mr. Saylor
17 disciplined Ms. Pina for not providing the presentation
18 to him three days before the trip?
19    A. I am not aware.
20    Q. Are you aware of whether or not Mr. Saylor
21 disciplined Ms. Pina for not providing the presentation
22 to him the day before the trip?
23    A. I am not aware of any disciplinary action, no.
24    Q. You have indicated that at least to your
25 knowledge Mr. Saylor did receive some type of

Page 67

1  presentation from Ms. Pina, correct?
2     A. Correct.
3     Q. By the way, I'm not sure if I ever clarified
4  this completely. What exactly is Mr. Saylor's title?
5     A. He's the vice president of the franchise system,
6  American Shaman Franchise System.
7     Q. Who does he report to?
8     A. Vince Sanders.
9     Q. Okay. So Mr. Saylor would necessarily be at the
10 top of the food chain at American Shaman Franchise
11 Systems Inc., so to speak, outside of Mr. Sanders?
12    A. Correct.
13    Q. In your personal capacity, Ms. Geither, you have
14 no knowledge of the events or the statements that were
15 made on around Thursday, February 13th, 2020 between Ms.
16 Pina and Mr. Saylor, correct?
17    A. Correct.
18    Q. You weren't there, right?
19    A. I was not there.
20    Q. You don't know whether or not Mr. Saylor may
21 have engaged in disturbing behavior or whether Ms. Pina
22 may have engaged in purported disturbing behavior,
23 correct?
24    A. Correct. I was not there.
25    Q. You don't know whether or not Mr. Saylor was

Page 68

1  disgruntled or anything of that nature, correct?
2     A. Correct.
3     Q. You don't know how complete the presentation may
4  have been, correct?
5     A. Correct.
6     Q. You indicated earlier that someone else had to
7  go perform the presentation. Do you know who that was?
8     A. Yes.
9     Q. Who was that?
10    A. Warren Hoover and Angel Nottage.
11    Q. Okay. What was the first name again?
12    A. Warren, W-a-r-r-e-n, Hoover. And Angel Nottage,
13 N-o-t-t-a-g-e.
14    Q. Did Mr. Saylor perform the investigation --
15 excuse me, perform the presentation?
16    A. Honestly, I didn't see the presentation. I
17 wasn't there at the presentation, so I don't know who
18 performed it.
19    Q. Now, you indicated that Ms. Pina was terminated
20 the following week, correct?
21    A. Correct.
22    Q. Do you recall who told Ms. Pina she was
23 terminated?
24         MR. PORTO: I will object to the form of
25 the question. It's been asked and answered.

Case 4:21-cv-00772-WBG   Document 36-2   Filed 11/02/22   Page 15 of 15
17 (Pages 65 to 68)
CRAWFORD REPORTING -- CrawfordReporting@gmail.com