# Transcript of the Testimony of
# **Marc Sayler**

**Date:** August 30, 2022

### Sage Pina vs. Shaman Botanicals

CRAWFORD REPORTING
(816) 507-9630
CrawfordReporting@gmail.com



**5**

1      THE REPORTER:  Today is Tuesday, August
2  30, 2022.  The time is 9:03 a.m.  We are here for the
3  Zoom deposition of Mark Sayler in the case of Sage Pina
4  vs. Shaman Botanicals, LLC, et al.
5      Would all counsel present please state your
6  name, whom you represent, and your agreement to the
7  remote administration of the oath.
8      MR. STALLWORTH:  Shaun Stallworth on
9  behalf of Plaintiff Sage Pina.  And we agree to the
10  remote administration of the oath.
11      MR. PORTO:  Nick Porto for the Defendants.
12  And we also agree to the remote administration of the
13  oath.
14          MARC SAYLER,
15  a witness, having been produced via Zoom, sworn and
16  examined, testified as follows on:
17  EXAMINATION BY MR. STALLWORTH:
18  Q.  Good morning, Mr. Sayler.
19  **A.  Good morning.**
20  Q.  Could you please state your full name for the
21  record?
22  **A.  Mark Sayler.**
23  Q.  Okay.  What is your date of birth?
24  **A.  8/19/1965.**
25  Q.  What's your current address?

**6**

1  **A.  1221 Pennsylvania Avenue, Apartment 2206, Kansas**
2  **City, Missouri 64105.**
3  Q.  Are you on any medications today that would keep
4  you from answering any and all of my questions
5  truthfully?
6  **A.  No.**
7  Q.  All right, sir.  I am pulling up what's been
8  marked as Plaintiff's Exhibit No. 8.  Have you seen this
9  document before?
10  **A.  I believe so.**
11  Q.  Okay.  It just simply indicates that we are here
12  today to take your deposition in the case of Sage Pina
13  versus Shaman Botanicals, LLC, doing business as American
14  Shaman and American Shaman Franchise Systems, Inc., okay?
15  **A.  Okay.**
16  Q.  Have you ever had your deposition taken before?
17  **A.  No.**
18  Q.  Okay.  Just a few grounds rules for you.  I am
19  going to ask you a number of questions.  I will ask that
20  you give me the opportunity to answer, okay?
21  **A.  Okay.**
22  Q.  I am going to give you the opportunity to
23  respond and I will ask that all your responses be in a
24  verbal manner, all right?
25  **A.  Okay.**

**7**

1  Q.  I will ask that we not talk over each other so
2  that we can keep a clean record for the court reporter,
3  okay?
4  **A.  Okay.**
5  Q.  I don't anticipate us to be here long today.
6  But should you need a break, please just let me know, all
7  right?
8  **A.  Okay.**
9  Q.  What is the difference between American Shaman
10  Franchise Systems Inc. and Shaman Botanicals?
11  **A.  They are two separate companies.**
12  Q.  Okay.  What is American Shaman Franchise
13  Systems, Inc.?
14  **A.  American Shaman Franchise Systems is in the**
15  **business of selling franchises.**
16  Q.  So that is in a sense a corporate entity, so to
17  speak?
18  **A.  Yes.**
19  Q.  Okay.  And what is Shaman Botanicals?
20  **A.  Shaman Botanicals is the manufacturer of CBD**
21  **products.**
22  Q.  Okay.  And does Shaman Botanicals then sell its
23  product to the franchisees of American Shaman Franchise
24  Systems, Inc.?
25  **A.  Yes.**

**8**

1  Q.  Is there overlap of employees between Shaman
2  Botanicals and American Shaman Franchise System, Inc.?
3  **A.  Yes, I believe so.**
4  Q.  Okay.  So Shaman Botanicals is where they
5  produce the product.  In a sense it is a manufacturing
6  facility, so to speak?
7  **A.  Yes.**
8  Q.  Okay.  Does Shaman Botanicals have a Human
9  Resources office?
10  **A.  Yes.**
11  Q.  Okay.  And American Shaman Franchise Systems,
12  Inc., that is where they may have representatives who are
13  trying to sell franchisees, so to speak -- sell
14  franchises, so to speak?
15  **A.  Yes.**
16  Q.  Okay.  Did Sage Pina work at both locations?
17  **A.  Did she?**
18  Q.  Yes, sir.
19  **A.  No.**
20  Q.  Which location did she work at?
21  **A.  She worked at the Franchise System.**
22  Q.  Okay.  So Ms. Pina had no interaction or no
23  duties with respect to Shaman Botanicals; is that right?
24  **A.  No.**
25  Q.  Okay.  What about human resources?  Did Shaman

9

1  Botanicals share any human resources individuals with
2  American Shaman Franchise Systems, Inc.?
3      A.  Yes.
4      Q.  Which individuals were those?
5      A.  Luke Mancillas.
6          THE REPORTER:  I'm sorry?
7          THE WITNESS:  Luke Mancillas.
8          THE REPORTER:  Okay.  I'm having a hard
9  time hearing you again.  It's as if you're further away
10 from the speaker.  I'm sorry.
11         THE WITNESS:  Mo problem.
12         MR. PORTO:  Mancillas is spelled
13 M-a-n-c-i-l-l-a-s.
14     Q.  (BY MR. STALLWORTH)  And what was Mr. Mancillas'
15 title?
16     A.  Human resources.
17     Q.  Okay.  Human resources manager or just simply
18 human resources?
19     A.  Just human resources.  He was the only one.
20     Q.  Okay.  And so he would be the individual that
21 would deal with employee complaints at either location?
22     A.  Yes.
23     Q.  Are there any other individuals whom worked at
24 both American Shaman Franchise Systems, Inc. as well as
25 Shaman Botanicals?

10

1      A.  Not that I recall.
2      Q.  Do you work at both American Shaman Franchise
3  Systems, Inc as well as Shaman Botanicals?
4      A.  I do not.
5      Q.  Also, can we agree that if I simply say
6  "American Shaman" I am simply referencing American Shaman
7  Franchise Systems, Inc.?
8      A.  I'm sorry.  Could you please ask the question
9  again?
10     Q.  Basically, I just want to use a shorthand so I
11 don't have to say that long name every time.  So if I
12 just simply say "American Shaman," can we agree that I am
13 referencing American Shaman Franchise Systems, Inc.?
14     A.  Yes.
15     Q.  Similarly, but not quite as long, but if I just
16 say "Shaman Botanicals," can we agree I am saying Shaman
17 Botanicals, LLC, doing business as American Shaman?
18     A.  Yes.
19     Q.  All right.  Thank you.
20         Sir, why was Sage Pina terminated?
21     A.  Failure to perform her duties.
22     Q.  What duties?
23     A.  Well, her particular duty was to do a
24 presentation at the convention and she did not have her
25 presentation ready.

11

1      Q.  Okay.  And what parts of the presentation -- or
2  rather, what was the purpose of the presentation?
3      A.  To help educate franchisees on how to use social
4  media to grow their business.
5      Q.  And were there any particular criteria that was
6  supposed to be addressed in the presentation?
7      A.  Yes.
8      Q.  What was that?
9      A.  There was an outline that I had sent her.
10     Q.  When did you send it?
11     A.  I don't recall.  I can look it up.
12     Q.  Okay.  And you sent that --
13     A.  I sent --
14     Q.  Go ahead, sir.
15     A.  Prior.
16     Q.  You sent that through e-mail?
17     A.  Yes.
18     Q.  Okay.  And in that e-mail did you provide an
19 outline for her to provide -- excuse me, as I understand
20 it, you provided an outline with respect to the criteria
21 that you wanted in the presentation?
22     A.  I did.
23     Q.  Did you provide a deadline to provide it to
24 her -- to you, rather?
25     A.  Yes.

12

1      Q.  What was that deadline?
2      A.  I did not provide it in the e-mail.  I did it
3  verbally.
4      Q.  Okay.  Is there any written documentation where
5  you provided a deadline of when she should provide the
6  presentation?
7      A.  I don't believe so.
8      Q.  You say you did this verbally; is that right?
9      A.  Correct.
10     Q.  Okay.  And what was the deadline that you
11 verbally provided?
12     A.  Ten days before the meeting.
13     Q.  All right.  And you say that -- excuse me.
14         Who made the decision to terminate Ms. Pina?
15     A.  I did.
16     Q.  Anyone else?
17     A.  No.
18     Q.  When did you make the decision?
19     A.  At the conference.
20     Q.  What day, do you recall?
21     A.  February 12th.
22     Q.  Did you provide any information to Luke
23 Mancillas who dealt with human resources?
24     A.  Not that day.
25     Q.  When did you provide information to him?

**13**

1    A.   Actually, the information I provided was to
2  Vince Sanders and to Jamie Willard.  And I don't remember
3  when I told Luke.  I don't remember.
4    Q.   Did you consult with Luke or were you simply
5  telling him this was a decision that you had made?
6    A.   I would have said that this is the decision that
7  I made.
8    Q.   Okay.  And you said you also spoke to Vince
9  Sanders; is that right?
10   A.   That's correct.
11   Q.   Okay.  Why did you speak to Mr. Sanders?
12   A.   Because he's my boss and I wanted to let him
13  know what I was doing.
14   Q.   Did you want his approval before you fired
15  Ms. Pina or were you simply telling him as well that you
16  were terminating her?
17   A.   I was telling him.
18   Q.   Okay.  What did he say?
19   A.   He said okay.
20   Q.   So you simply were advising him of what you were
21  doing.  You weren't looking for any prior approval,
22  correct?
23   A.   I don't really know how to answer it.  Because
24  if he had an objection to it, he would have said so.  So,
25  yeah, you know, it was my decision to make, so I made it.

**14**

1    Q.   Okay.  What is your role with the company, sir?
2    A.   I am vice president of the Franchise Systems.
3    Q.   Okay.  And you report directly to Mr. Sanders?
4    A.   That's correct.
5    Q.   So are you in a sense the second in command of
6  the Franchise System?
7    A.   That is correct.
8    Q.   And by Franchise System, we're referencing
9  American Shaman, correct?
10   A.   Yes.
11        MR. PORTO:  How about for ease of the
12  record we just call it "the Franchise System"?  Cool with
13  that?
14        MR. STALLWORTH:  I'm fine with that.
15  That's fine.  We can use your word.  If you don't like my
16  words, Nick, we can use your words if that is better.
17        MR. PORTO:  I think it is a nice record so
18  far.  May as well keep it simple.
19        MR. STALLWORTH:  Okay.  All right.
20   Q.   (BY MR. STALLWORTH)  So we'll just -- for
21  American Shaman Franchise Systems, Inc., we'll just say
22  "Franchise Systems."  Your counsel bullied me into it.
23        All right.  So I think you were saying that you
24  did speak to Mr. Sanders; is that right?
25   A.   Yes.

**15**

1    Q.   And you are the vice president of the Franchise
2  System, correct?
3    A.   Correct.
4    Q.   Had Ms. Pina ever been disciplined previously?
5    A.   No.
6    Q.   Had she ever been written up?
7    A.   No.
8    Q.   Had she ever be suspended?
9    A.   No.
10   Q.   How long had she been working there prior to her
11  termination?
12   A.   A couple months.
13   Q.   Did you ever actually receive the presentation?
14   A.   Yes.
15   Q.   Did Ms. Pina present the presentation to the
16  franchisees?
17   A.   Could you please ask the question again?
18   Q.   Sure.  Did Ms. Pina actually present the
19  presentation to the franchisees?
20   A.   She did not.
21   Q.   Who presented that?
22   A.   Presented that presentation or a presentation?
23   Q.   Presented the presentation -- let's put it like
24  this.  She was supposed to present on social media,
25  correct?

**16**

1    A.   Correct.
2    Q.   And by the way, do you know what time of day
3  that presentation took place?
4    A.   One o'clock, I believe.
5    Q.   Okay.  And who did the presentation regarding
6  social media in her stead?
7    A.   Warren Hoover and Angel Nottage.
8        THE REPORTER:  The last name again?
9        THE WITNESS:  Nottage.  Think cottage but
10  Nottage.
11   Q.   (BY MR. STALLWORTH)  Did they come up with their
12  own presentation?
13   A.   Yes.
14   Q.   They did not use Ms. Pina's presentation?
15   A.   They did not use Ms. Pina's presentation.
16   Q.   Do you have a copy of their presentation?
17   A.   I may.  I don't know.
18   Q.   Would you be able to look for that for me if
19  requested?
20   A.   Yes.
21   Q.   Have you ever been a party to a lawsuit, sir?
22   A.   Yes.
23   Q.   And which -- how many times, rather?
24   A.   Once.
25   Q.   And what were the circumstances of that lawsuit?

**21**

1    Q.  Sure.  If there are employee concerns, under the
2  policy, do the employees bring those concerns to you or
3  to Human Resources or could they bring those concerns to
4  either of you?
5    A.  Either.
6    Q.  As the VP of the Franchise System, are you
7  ultimately tasked with interpreting the company's rules
8  and procedures for employees?
9    A.  No.
10    Q.  Who would be ultimately tasked with interpreting
11  the company's rules and procedures for employees?
12    **A.  Human Resources.**
13    Q.  Okay.  Who does Human Resources report to?
14    **A.  Myself and Vince.**
15    Q.  Okay.  So Human Resources would report to you?
16    **A.  And then the other side, too.**
17    Q.  What do you mean by "the other side"?
18    **A.  Shaman Botanicals.**
19    Q.  So I guess you are indicating that -- well, I
20  just want to make sure I understand what you are saying.
21  If Shaman Botanicals has an issue with employees, does
22  that ultimately come to you as well?
23    **A.  It does not.**
24    Q.  Okay.  So you are simply dealing with employees
25  under the Franchise System, correct?

**22**

1    **A.  That's correct.**
2    Q.  All right.  And if there are issues or concerns
3  with employees that need to be elevated to Human
4  Resources, they would bring those concerns to Human
5  Resources rather than bring those concerns to you,
6  correct?
7    **A.  Correct.**
8    Q.  Have you ever dealt with matters involving
9  discrimination, harassment or retaliation in your time at
10  Franchise Systems?
11    **A.  No.**
12    Q.  Have you ever performed any investigations with
13  respect to discrimination, harassment or retaliation in
14  your time with the Franchise System?
15    **A.  Harassment, what do you mean by harassment?**
16    Q.  Well, I guess --
17    **A.  Is this harassment or is it just like somebody**
18  **not getting along with somebody else?  That is what I**
19  **want to know.**
20    Q.  I guess that would be up to the interpretation.
21  Certainly there are some instances that would be employee
22  disputes.  But if an employee is alleging, I have been
23  discriminated against for X reason, have you ever had to
24  deal with complaints of that sort?
25    **A.  No.**

**23**

1    Q.  Have you ever had to deal with investigations of
2  the sort where an employee alleges that they have been
3  discriminated against because of, for instance, their
4  race or their sex?
5    **A.  No.**
6    Q.  Has anyone ever brought complaints of
7  discrimination as it relates to race or sex to you during
8  your time as the VP of the Franchise Systems?
9    **A.  No.**
10    Q.  If human Resources -- or rather, let me back up.
11       It sounds as though you're indicating that Human
12  Resources should perform an investigation as it relates
13  to complaints of discrimination, harassment or
14  retaliation, correct?
15       MR. PORTO:  I will object to the form of
16  the question.  Misstates the prior testimony, lacks
17  foundation.  Go ahead and answer if you know.
18    **A.  Can you please ask the question again?**
19    Q.  (BY MR. STALLWORTH)  You don't perform
20  investigations as it relates to discrimination,
21  harassment or retaliation, as I understand your
22  testimony; is that correct, sir?
23    **A.  That's correct.**
24    Q.  Would you ever conduct an investigation as it
25  relates to complaints of discrimination, harassment or

**24**

1  retaliation?
2    **A.  You are asking me if I would?**
3    Q.  Yes.  Or would it go through Human Resources?
4    **A.  It would go through Human Resources.**
5    Q.  Okay.  And if Human Resources conducted a
6  complaint as it relates to discrimination, harassment or
7  retaliation, and determined that there was a basis for
8  that complaint and there may be remedial actions, Human
9  Resources would then bring it to your attention, correct?
10       MR. PORTO:  I will object to the form of
11  the question.  Calls for speculation and lacks
12  foundation.
13    Q.  (BY MR. STALLWORTH)  You can answer.
14    **A.  Yeah, that's correct.  But also -- excuse me.**
15  Back up.  Can you please ask the question one more time?
16    Q.  Sure.  Well, if Human Resources were to conduct
17  an investigation as it relates to complaints of
18  discrimination, harassment or retaliation, and
19  subsequently found there may be a basis to the complaints
20  or at least further investigation needed, Human Resources
21  would potentially bring that complaint to you, right?
22    **A.  That's correct.**
23    Q.  Because there may be some type of remedial
24  action that may include disciplinary action, up to or
25  including termination, correct?

6 (Pages 21 to 24)
Case 4:21-cv-00772-WBG   Document 36-3   Filed 11/02/22   Page 5 of 17
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

25

1    **A. Correct.**
2    Q. And that's a decision that would have to be made
3 by you, correct?
4    **A. Yes.**
5    Q. Okay. Human Resources doesn't have the ability
6 to simply terminate individuals on their own, do they?
7    **A. They do not.**
8    Q. Does the Franchise Systems engage in training as
9 it relates to discrimination, harassment or retaliation
10 for employees?
11    **A. Yes.**
12    Q. When does that occur?
13    **A. Once a year.**
14    Q. Okay. Is it typically during the same time
15 every calendar year or do you recall when that normally
16 occurs?
17    **A. I can't recall.**
18    Q. Okay. Is that in writing?
19    **A. It is an online thing that we take.**
20    Q. Okay. So there is an online module of some sort
21 is what you are indicating?
22    **A. Correct.**
23    Q. Do you have documentation of employees
24 completing this online training?
25    **A. Can I ask you a question?**

26

1    Q. Yes, sir.
2    **A. Are you referring to the time, back February of**
3 **2020, or are you referring to presently?**
4    Q. Well, that's a great distinction. I hadn't
5 whittled down that time line yet. But if you would like
6 to provide a distinction for me, that would be great too.
7    **A. At that time that wasn't -- that did not exist.**
8    Q. Okay. So in or around February 2020, there was
9 no training as it relates to discrimination, harassment
10 or retaliation?
11    **A. Correct.**
12    Q. Okay. When did this training begin?
13    **A. 2021.**
14    Q. Okay. So beginning in 2021 there was online
15 training as it relates to discrimination, harassment and
16 retaliation?
17    **A. Correct.**
18    Q. All right. I am pulling up what's been marked
19 as Plaintiff's Exhibit No. 1. Can you see this document,
20 sir?
21    **A. Uh-huh.**
22    Q. Is that a "yes"?
23    **A. Correct.**
24    Q. And this says, "Employee Handbook," and it is
25 dated January 2019. Do you see that?

27

1    **A. I do.**
2    Q. Would this have been the employee handbook that
3 would have been in effect in and around the time you
4 terminated Ms. Pina?
5    **A. Possibly, most likely.**
6    Q. Is there another employee handbook that the
7 Franchise Systems uses currently?
8    **A. Yeah, I believe it's been updated a couple times**
9 **since then.**
10    Q. Okay.
11    **A. So that's why I don't know whether or not that**
12 **was the one. If this was early 2019, that is why I don't**
13 **know if that's the same one.**
14    Q. Would you be able to go back and check for me?
15    **A. Probably.**
16    Q. All right. All right. I am going to go through
17 a couple points of this. I am on what is indicated as
18 DEF 007 with a Bates label. And there is a heading that
19 says, "Equal Opportunity Employer."
20       Do you see that, sir?
21    **A. I do.**
22    Q. Would you read the first paragraph for me?
23    **A. "American Shaman Franchise Systems, Inc. is an**
24 **equal employment opportunity employer. American Shaman**
25 **Franchise Systems, Inc. will provide equal employment**

28

1 **opportunities without regard to race, color, sex, age" --**
2       Part of it's --
3       MR. PORTO: I need to make a --
4 Mr. Sayler's picture is blocking --
5       THE WITNESS: Let me move that down a
6 little bit.
7       MR. PORTO: Is that better?
8       THE WITNESS: Yeah.
9       MR. PORTO: Why don't you start from the
10 start?
11    **A. "American Shaman Franchise Systems, Inc., is an**
12 **equal employment opportunity employer. American**
13 **Shaman" --**
14       MR. PORTO: Shaun, every time you blow
15 up --
16       MR. STALLWORTH: Is this better? Do you
17 want me to leave it alone?
18       THE WITNESS: I will put my glasses on.
19 It's all right.
20       Okay. "American Shaman Franchise Systems, Inc.
21 is an equal employment opportunity employer. American
22 Shaman Franchise Systems, Inc. will provide equal
23 employment opportunities without regard to race, color,
24 sex, age, disability, religion, national origin, marital
25 status, sexual orientation, ancestry, political belief or

**33**

1   A. Yes.
2   Q. "You may submit a report verbally or in writing
3 and may even submit such report anonymously if you
4 choose. Reporting violations of any policy are to be
5 reported in the same manner described herein unless
6 otherwise designated."
7      Do you that?
8   A. I do.
9   Q. Have you always understood that to be a true and
10 accurate statement?
11   A. Yes.
12   Q. It goes on to say, "Employees that report any
13 issue, concern, or violation in good faith will not be
14 retaliated against. Likewise, anyone reporting an
15 intentionally false claim will be subject to negative
16 consequences to their employment, up to and including
17 termination."
18      Do you see that?
19   A. I do.
20   Q. Have you always understood that to be a true and
21 accurate statement?
22   A. I do.
23   Q. It goes on to say that, "Management will take
24 every effort to resolve matters in a timely and
25 confidential manner."

**34**

1      Do you see that?
2   A. I do.
3   Q. Have you always understood that to be a true and
4 accurate statement?
5   A. Yes.
6   Q. The next page, which has a Bates label of DEF
7 009, there is a heading for "Whistleblower Protection."
8      Do you see that?
9   A. Uh-huh.
10   Q. Is that a "yes," sir?
11   A. Yes. Sorry, yes.
12   Q. And it indicates that, "It is the goal of
13 American Shaman Franchise Systems, Inc. to comply with
14 all applicable federal, state, and local laws. Employees
15 have the right to report in good faith what they
16 reasonably believe to be a violation of state or federal
17 law or conditions or practices that would put the health
18 or safety of employees at risk. No employees will be
19 discharged, threatened or discriminated against in any
20 manner for reporting in good faith what they reasonably
21 believe to be wrongdoing."
22      Do you see that?
23   A. I do.
24   Q. Have you always understood that to be a true and
25 accurate statement?

**35**

1   A. I do.
2   Q. The next statement rather indicates that, "In
3 the event an employee has reasonable cause to believe any
4 employee, manager, or other American Shaman Franchise
5 Systems, Inc. representative is failing to comply with
6 applicable law and/or is requesting the employee engage
7 in conduct that violates applicable law, the employee
8 should immediately report the situation and provide an
9 opportunity for the situation to be remedied."
10      Do you see that?
11   A. Yes.
12   Q. Have you always understood that to be a true and
13 accurate statement?
14   A. Yes.
15   Q. "Any employee who believes he or she is being
16 subjected to retaliation for exercising his or her rights
17 under this policy should immediately report the
18 situation. Nothing in this policy is intended to or
19 should be interpreted as preventing or prohibiting an
20 employee from cooperating with or disclosing information
21 to an appropriate government or law enforcement agency."
22      Do you see that?
23   A. I do.
24   Q. Have you always understood that to be a true and
25 accurate statement?

**36**

1   A. Yes.
2   Q. There is another heading that says, "Code of
3 Ethics and Professional Conduct."
4      Do you see that?
5   A. Yes.
6   Q. It lists out a number of examples of what may be
7 deemed to be unacceptable behavior in the workplace. Do
8 you see that?
9   A. Uh-huh.
10   Q. Is that a "yes," sir?
11   A. Yes.
12   Q. And then in the second bullet point one of the
13 examples indicates, making derogatory, inaccurate, or
14 untruthful statements regarding Franchise System or
15 Franchise Systems' employees, vendors, or clients in
16 either verbal or written form. Do you see that?
17   A. I do.
18   Q. Have you always understood that to be a true and
19 accurate statement?
20   A. Yes.
21   Q. The last bullet point on DEF 009 indicates that
22 harassing, fighting, or other acts of violence would be
23 against the company policy; is that right?
24   A. That's correct.
25   Q. Have you always understood that to be a true and

**41**

1  to promptly report it to their immediate supervisor or
2  the Human Resources Department."
3      Do you see that, sir?
4    **A.  Yes.**
5    Q.  And that's consistent with your earlier
6  statement that employees can make complaints of
7  discrimination, harassment or retaliation, for instance,
8  to a supervisor or the Human Resources Department; is
9  that correct?
10    **A.  That is correct.**
11    Q.  It says, "Retaliation against any individual who
12  makes a good faith complaint or provides any information
13  regarding harassment, including participation in a
14  harassment investigation, will not be tolerated.  Any
15  individual who engages in retaliation is in violation of
16  this policy and will be disciplined accordingly, up to
17  and including termination."
18      Do you see that?
19    **A.  Yes.**
20    Q.  Have you always understood that to be a true and
21  accurate statement?
22    **A.  Yes.**
23    Q.  There is another heading right after that,
24  "Discipline."
25      Do you see that?

**42**

1    **A.  I do.**
2    Q.  It indicates that, "Any employee found to have
3  engaged in sexual or other harassment will be subject to
4  disciplinary action, which may include termination of
5  employment."
6      Do you see that?
7    **A.  I do.**
8    Q.  Have you always understood that to be a true and
9  accurate statement?
10    **A.  Yes.**
11    Q.  Earlier I asked you how long Ms. Pina had been
12  working for the Franchise Systems.  Do you recall that?
13    **A.  I do.**
14    Q.  And you indicated that she had been working for
15  the Franchise Systems for several months, correct?
16    **A.  That is not correct.**
17      MR. PORTO:  I object to the question.
18  Misstates the prior testimony.
19    Q.  (BY MR. STALLWORTH)  I am not trying to trip you
20  up.  I thought that was your testimony.
21    **A.  I said a couple months.**
22    Q.  Yeah, that is what I said.  You indicated she
23  had been working for a couple months, correct?
24    **A.  Yeah, you just phrased it a little different**
25  **earlier.  You said several months.  To me several is**

**43**

1  three; a couple is two.
2    Q.  Okay.  I promise I am not trying to trip you up
3  here.  Two months, two to three months?
4    **A.  Two months.  I think it's actually less than two**
5  **months, but I don't recall without looking at a calendar.**
6    Q.  Fair enough.
7      Okay.  Do you recall whether or not Ms. Pina had
8  worked for Franchise Systems previously?
9    **A.  She had not.**
10    Q.  Had she worked for any type of franchise
11  whatsoever that is associated with American Franchise
12  Systems, Inc.
13    **A.  She had not.**
14    Q.  Okay.  So it is your testimony that you are not
15  aware of Ms. Pina ever working for Franchise System or
16  any franchisee related to the Franchise System?
17    **A.  She worked for a corporate store.**
18    Q.  Okay.  Maybe that is my misunderstanding.  Can
19  you explain the difference?
20    **A.  Yeah.  A corporate store is owned by CBD**
21  **American Shaman.  It is not a franchise.  A franchise**
22  **store is owned by a separate individual that is a**
23  **franchisee.  Contract --**
24    Q.  Okay.  So she -- I'm sorry.  Go ahead.
25    **A.  They are under contract.  It's a different**

**44**

1  relationship.
2    Q.  Okay.  So she worked for a corporate store that
3  is owned by -- could you say it again?
4    **A.  CBD American Shaman.**
5    Q.  So CBD American Shaman is the -- they have a
6  number of corporate stores, so to speak?
7    **A.  Right.**
8    Q.  Who is the owner of CBD American Shaman?
9    **A.  Vince Sanders.**
10    Q.  Who is the owner of American Shaman Franchise
11  Systems, Inc.?
12    **A.  Vince Sanders.**
13    Q.  Do you know where Ms. Pina was located when she
14  was still working for CBD American Shaman?
15    **A.  I believe she was working at the Boston**
16  **corporate store on Newbury Street.**
17    Q.  And did you personally interview Ms. Pina about
18  working at the Franchise Systems?
19    **A.  I did.**
20    Q.  Okay.  And what do you recall her title would be
21  if she made the change from CBD American Shaman to the
22  Franchise Systems?
23    **A.  Social media advisor or coordinator.  We hadn't**
24  **defined it at the time.**
25    Q.  Okay.  I'm assuming that the purpose of the move

45

1  was to assist with social media; is that right?
2      A.  Yes.
3      Q.  Okay.  And it is your recollection that Ms. Pina
4  may have worked two or less than two months prior to her
5  termination; is that right?
6      A.  Correct.
7          (Discussion off the record.)
8      Q.  (BY MR. STALLWORTH)  In January 2021 -- excuse
9  me, 2020 I guess, there were a number of complaints.
10  Were you aware that there were a number of complaints of
11  employees that felt they were being racially
12  discriminated against or harassed?
13         MR. PORTO:  I will object to the form of
14  the question.  Lacks foundation.  Go ahead and answer if
15  you know.
16     A.  Go ahead and ask the question again, please.
17     Q.  (BY MR. STALLWORTH)  Were you aware that there
18  were employee complaints of discrimination and/or
19  harassment in January 2020?
20         MR. PORTO:  Same objection.
21     A.  I was not.
22     Q.  (BY MR. STALLWORTH)  I am going to pull up
23  what's been marked as Plaintiff's Exhibit No. 5.
24      Have you seen this screen shot of this text
25  message before, sir?

46

1      A.  I think I have.
2      Q.  When did you see it?
3      A.  I don't recall.
4      Q.  Do you recall seeing it in or around January
5  2020?
6      A.  I do not recall.
7      Q.  Is there an individual that -- or rather do you
8  recall a Thomas Miley or rather Thomas Miles that worked
9  at the Franchise Systems?
10     A.  Yes.
11     Q.  Do you recall a Kathi Miley that worked at the
12  Franchise Systems?
13     A.  Yes.
14     Q.  What was Ms. Miley's job title?
15     A.  Director of franchise development.
16     Q.  What were her duties or responsibilities?
17     A.  She was responsible for the onboarding of
18  franchisees or franchises.
19     Q.  Basically getting them set up, ready to go,
20  things of that nature, so to speak?
21     A.  Yeah.  Getting their paperwork together, make
22  sure all the steps of the process are completed.
23     Q.  Did Ms. Miley report directly to you?
24     A.  She did.
25     Q.  Now, this meme -- or rather, excuse me, this is

47

1  a screen shot.  And you indicated that you believe you
2  saw this previously, correct?
3      A.  I think I have seen a meme previously.
4      Q.  Okay.  Let me be more specific then.  So you
5  think you have seen the meme previously.  Where do you
6  think you saw it at?
7      A.  I think on social media someplace.
8      Q.  Okay.  Was it sent to you or were you just
9  scrolling through pages?
10     A.  Scrolling through pages.
11     Q.  Okay.  What type of pages were you scrolling
12  through; do you remember?  Were you on Facebook?
13     A.  I have no idea.  It just looks familiar.
14     Q.  I see.  Okay.  And at the top it says, "What's
15  black and never works?"
16         Do you see that?
17     A.  Uh-huh.
18     Q.  Is that a "yes," sir?
19     A.  Yes.
20     Q.  All right.  And then at the bottom of the meme
21  it says, "Decaffeinated coffee, you racist bastard."
22         Do you see that?
23     A.  I do.
24     Q.  Okay.  Now, I don't know if you might find this
25  offensive.  But would you be surprised that some

48

1  individuals might find this offensive?
2      A.  I would not.
3      Q.  You could understand how someone might find that
4  meme offensive, correct?
5      A.  I could.
6      Q.  Are you aware that Ms. Miley sent this to Thomas
7  Miles?
8      A.  I was not.
9      Q.  Okay.  Were you aware that Mr. Miles felt
10  racially discriminated against by Ms. Miley?
11     A.  No, I was not aware.
12     Q.  And do you recall ever seeing this document in
13  or around January 2020?
14         MR. PORTO:  I object to form.  It's been
15  asked and answered.  Answer if you know.
16     A.  I do not.
17     Q.  (BY MR. STALLWORTH)  Do you believe it would be
18  appropriate for an individual -- or rather an employee to
19  send a meme like this to another employee?
20     A.  I believe it would be inappropriate in most
21  cases.
22     Q.  Was -- or rather let me ask this.  Is Ms. Miley
23  still working for the Franchise Systems?
24     A.  She is.
25     Q.  Do you know if Thomas Miles is still working for

Case 4:21-cv-00772-WBG   Document 36-3   Filed 11/02/22   Page 9 of 17
12 (Pages 45 to 48)
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

---

---

**53**

1    A.  Correct.
2    Q.  And that Human Resources would then report those
3  complaints to management, correct?
4    A.  Correct.
5    Q.  Okay.  As I understand your testimony today, you
6  have indicated that you do not recall any -- well, let me
7  ask you -- let me put it this way.
8      Are you saying you do not recall or are you
9  saying it didn't happen that Mr. Mancillas did not
10  provide any complaints of discrimination or harassment
11  from employees to you in January 2020?
12    **A.  Yeah, that's true.  He did not provide any**
13  **complaints of discrimination to me at all in January**
14  **2020.**
15    Q.  Okay.  And so if those complaints were made to
16  Mr. Mancillas, there should have been an investigation,
17  correct?
18    **A.  If --**
19      MR. PORTO:  I will object to the form of
20  the question.  Improper hypothetical and assumes facts
21  not in evidence.
22    Q.  (BY MR. STALLWORTH)  You can answer, sir.
23    **A.  It's based on a preposition that we don't know**
24  **if it's true or not, so I can't answer it.  You're saying**
25  **if this happened, he should be fired, right?  You are**

**54**

1  **saying if it happened, he's not doing his job?  I'm not**
2  **sure what the question is.**
3    Q.  If Mr. Mancillas says that -- if Mr. Mancillas
4  acknowledges that complaints were made in January 2020,
5  there should have been an investigation, correct?
6      MR. PORTO:  Same objection.
7    **A.  So if he acknowledges that there were complaints**
8  **made, there should have been an investigation?**
9    Q.  (BY MR. STALLWORTH)  Correct.
10    **A.  Is that what you're asking?**
11    Q.  Yes.
12    **A.  The answer is yes.**
13    Q.  So if Mr. Mancillas said that he did tell you
14  that there were complaints in January 2020 -- rather
15  complaints of discrimination by Mr. Miles and
16  Ms. Thedford, you would say that Mr. Mancillas is lying?
17      MR. PORTO:  Same objection.
18    Q.  (BY MR. STALLWORTH)  You can answer, sir.
19    **A.  Yeah, correct.**
20    Q.  Okay.  Mr. Mancillas would have been the human
21  resources coordinator in around January 2020; is that
22  right?
23    **A.  That's correct.**
24    Q.  Does Mr. Mancillas still work for the company?
25    **A.  He does not.**

**55**

1    Q.  Do you recall when his employment with the
2  company concluded?
3    **A.  I will say a year ago.**
4    Q.  Okay.  Do you recall, was he terminated or did
5  he resign?
6    **A.  He resigned.  But he was not Human Resources**
7  **when he resigned.**
8    Q.  What was he when he resigned?
9    **A.  He was in accounting.**
10    Q.  Do you recall a conversation with Ms. Pina in
11  around late January 2020 where she told you that -- she
12  indicated that there were employee complaints with
13  respect to unequal pay or treatment in the workplace?
14    **A.  No, I do not.**
15    Q.  Do you recall telling Ms. Pina to stop the
16  chatter?
17    **A.  No.**
18    Q.  Are you saying you don't recall or it didn't
19  occur?
20    **A.  I am saying I don't recall.  We had a lot of**
21  **chats, so.**
22    Q.  To be clear, you are unaware of whether any
23  investigation occurred in January 2020 with respect to
24  complaints of discrimination or harassment by Thomas
25  Miles or Juanita Thedford; is that right?

**56**

1    **A.  That is correct.**
2    Q.  Are you aware that in early February 2020
3  Abraham Torres had spoken to Ms. Pina about contacting
4  the U.S. Department of Labor based upon concerns of
5  discrimination and unequal pay?
6    **A.  No, I am not aware.**
7    Q.  Are you aware of whether or not Abraham Torres
8  ever contacted the U.S. Department of Labor based upon
9  concerns of discrimination and unequal pay?
10    **A.  I do believe he contacted the EEOC regarding**
11  **unequal pay.**
12    Q.  Was there ever an investigation regarding to
13  Mr. Torres' complaints?
14    **A.  Yes.**
15    Q.  Okay.  Who performed the investigation?
16    **A.  I am not sure who did.  I know that the EEOC and**
17  **there was a deposition done and there were some questions**
18  **asked about it.  I think the EEOC conducted the**
19  **investigation.**
20    Q.  I guess my question is, was there any internal
21  investigation?
22    **A.  It depends on the context of investigation.  I**
23  **simply had a conversation with him because he complained**
24  **to me about it.  And I showed him where he wasn't being**
25  **paid unequally and that he was actually making more**

65

1  or requested a meeting with Vince Sanders once the
2  conference in Vegas had ended?
3      A.  I am not aware.
4      Q.  You indicated there was a conference that took
5  place in February, correct?
6      A.  Correct.
7      Q.  And that conference was for all the franchisees,
8  correct?
9      A.  Yes.
10      Q.  Earlier we spoke about the fact that you
11  terminated Ms. Pina for failure to perform her duties; is
12  that right?
13      A.  Correct.
14      Q.  And specifically by not providing the
15  presentation; is that right?
16      A.  Yes.
17      Q.  You indicated you did provide an outline for
18  her, correct?
19      A.  I did.
20      Q.  And that was in writing?
21      A.  Yes.
22      Q.  That was in an e-mail, correct?
23      A.  Yes.
24      Q.  However, you indicated that you don't have
25  anything in writing indicating when the deadline would be

66

1  for the presentation; is that right?
2      A.  That's correct.
3      Q.  You indicated that would have been verbally
4  provided to her?
5      A.  Yes.
6      Q.  You didn't write Ms. Pina up for or provide any
7  disciplinary action to her for not providing the
8  presentation to you seven days before the conference,
9  correct?
10      A.  Say that question again.  I am not sure.  Seven
11  days?
12      Q.  Well, it is my understanding that the Vegas
13  conference would have taken place or would have begun in
14  and around Tuesday, February 11th, 2020, correct?
15      A.  No, it began February 12th.
16      Q.  Okay.  So Wednesday, February 12th?
17      A.  Yes.
18      Q.  All right.  Did you discipline Ms. Pina, let's
19  say, seven days before that because she had not
20  provided -- let me finish the question real quick.
21      A.  Sorry.
22      Q.  Did you discipline Ms. Pina seven days before
23  that because she did not provide the presentation to you?
24      A.  Please define "discipline."
25      Q.  Did you write her up?

67

1      A.  No.
2      Q.  Did you suspend her?
3      A.  No.
4      Q.  Did you discipline Ms. Pina three days before
5  February 12th because she did not provide the
6  presentation to you?
7      A.  I did not.
8      Q.  Did you write her up?
9      A.  No.
10      Q.  Did you suspend her?
11      A.  No.
12      Q.  When did you arrive in Vegas?
13      A.  I believe Monday the 10th.
14      Q.  And was there any events with the employees that
15  had arrived in Vegas prior to the conference beginning on
16  Wednesday, February 12th?
17      A.  Yes.
18      Q.  What events were those?
19      A.  There was a social event at the LINQ ferris
20  wheel.
21      Q.  I didn't catch the last part.  What was that?
22      A.  Social event at the LINQ ferris wheel.
23      Q.  What day was that?
24      A.  I believe that was Tuesday.
25      Q.  How many employees attended that event?

68

1      A.  Well, it was a mix of employees and franchisees.
2  And I would say there was probably 30 people.
3      Q.  Okay.  Was alcohol involved?
4      A.  Yes.
5      Q.  Did you discipline Ms. Pina up to the time of
6  the social event at the LINQ ferris wheel on Tuesday,
7  February 11th, 2020?
8      A.  I didn't write her up and I didn't -- what was
9  the other thing you said?
10      Q.  Suspend her.
11      A.  I didn't suspend her or write her up.
12      Q.  What day was Ms. Pina supposed to present the
13  social media presentation?
14      A.  February 12th.
15      Q.  That would have been on Wednesday, February
16  12th?
17      A.  Yes.
18      Q.  And you are aware that Ms. Pina had left her
19  laptop in KC, correct?
20      A.  I was at one point aware of that.
21      Q.  And Ms. Pina did ultimately provide a
22  presentation to you, correct?
23      A.  No, she didn't -- well, it depends on how you
24  define presentation.  She provided an incomplete
25  presentation.

**Page 69**

Q. Okay. She provided a presentation to you, correct?

A. Yes, but it was incomplete.

Q. I understand that you may say it was incomplete. She provided a presentation to you. It may not have been to your standards, but she provided a document to you, correct?

A. I would argue that she didn't provide a presentation, because it wasn't a presentation.

Q. Okay. Pulling up what's been marked as Plaintiff's Exhibit No. 9. Do you see this document, sir?

A. Yes.

Q. The document is dated Wednesday, February 12th, 2020, correct?

A. Yes.

Q. Okay. This goes on to talk about visual marketing seminar, how to optimize social media platforms, things of that nature, correct?

A. Correct.

Q. This was a document that Ms. Pina provided to you, correct?

A. She did.

Q. And this is a document that you have indicated was not complete per your standards, correct?

**Page 70**

A. Per any standards.

Q. This was a document you indicated was not complete per your standards, correct?

A. As far as I am concerned, per any standard it was not complete.

Q. What do you mean by any standard? What does that mean?

A. Because there is template content still on it.

Q. Were you aware that Ms. Pina was acquiring information from other franchisees to input into the presentation?

A. I was not aware.

Q. That wasn't something that you had indicated to her that you wanted her to do?

A. No, I don't think I -- I don't believe so.

Q. You don't think it would have been important to have information from franchisees in the presentation?

A. Well, she is teaching the franchisees, not the franchisees teaching her.

Q. Well, she is providing information for what franchisees may need or want or what challenges they may have; it might have been pertinent, correct?

A. Yeah, and maybe she had that.

Q. Okay. So explain to me what happened in your communication with Ms. Pina as it relates to the

**Page 71**

PowerPoint.

A. The PowerPoint was incomplete. It wasn't ready one hour before the meeting that she was supposed to do.

Q. Okay. And what happened? Was there a conversation with her?

A. Yes.

Q. And what happened during the conversation?

A. I told her that that was unacceptable.

Q. Okay. What else?

A. That's about it. And that I was upset. I told her I was upset and disappointed that it wasn't done.

Q. Okay. And then what else happened at that point?

A. She told me that she didn't feel like that she should get reprimanded at that time.

Q. Were you reprimanding her at that time?

A. Yes.

Q. Did you terminate her on the spot?

A. No.

Q. Okay. What happened then?

A. She said that -- I told her that if she had that attitude, she didn't need to do the presentation. And she said, "I'm not going to do the presentation then," and walked away.

Q. Okay. So you were mad?

**Page 72**

A. Yes.

Q. You indicated that you were going to finish the presentation?

A. Yes. Well, I didn't indicate to her, but that's what I ended up -- at that particular time, that is what I set out to do.

Q. Okay. So you finished the presentation?

A. No, I didn't finish the presentation.

Q. Who finished the presentation?

A. A couple people that were there that also worked for me put a presentation together real fast and then they did the presentation at one o'clock.

Q. Okay. And this would have been Angel Nottage; is that right?

A. Angel Nottage and Warren Hoover.

Q. Angel Nottage and Warren Hoover. And so you're indicating that Angel Nottage and Warren Hoover put a presentation together within one hour?

A. Yes.

Q. You can provide that presentation, correct?

A. I don't know. I will have to look for it. We discussed this earlier. I will have to look for it.

Q. Right. But it is your testimony that that presentation was different than the presentation than Ms. Pina provided to you?

**73**

```
 1        A.  Is it what?
 2        Q.  Is it your testimony that that presentation that
 3   Ms. Nottage performed is different than the presentation
 4   that Ms. Pina provided to you?
 5        A.  Oh, correct.
 6        Q.  She didn't use any of the same PowerPoints, any
 7   of the same slides?
 8        A.  No.  Not that I am aware of.  But I am actually
 9   pretty sure.
10        Q.  You were there for the presentation, right?
11        A.  I was not.
12        Q.  Okay.  So you don't know what she did?
13        A.  Well, I saw the presentation.  They showed me.
14        Q.  Okay.  And so it is your testimony that the
15   presentation they showed you did not use any of
16   Ms. Pina's slides in their information?
17        A.  It is.
18        Q.  And that that presentation that they put
19   together within 45 minutes to an hour would have been
20   different than Ms. Pina's presentation?
21        A.  Well, the subject is the same, so I wouldn't say
22   it is different.  But I know that they didn't talk about
23   the planets in our solar system in their presentation.
24        Q.  So what did they use to put the presentation
25   together?  You gave them an outline.  I just want to make
```

**74**

```
 1   sure I understand this.
 2        A.  Sure.
 3        Q.  You say this would have occurred -- I mean, she
 4   sent you the presentation around 11:59 a.m.  You say the
 5   presentation was at one o'clock?
 6        A.  Yeah.
 7        Q.  So this communication with Ms. Pina happens and
 8   then what?  How do you reach out to Ms. Nottage?
 9        A.  Well, they were both in the area at the time.
10        Q.  In the area?  You mean that they were standing
11   next to you, they were in the next conference room?
12        A.  In the same general area.  They were not
13   standing next to me.
14        Q.  Did you call them?
15        A.  I probably did.  I probably saw them and walked
16   over and asked them for help.  I don't remember how that
17   happened, but that is probably what happened.
18        Q.  Okay.  All right.  And so you would have
19   communicated with them at some point?
20        A.  Yes.
21        Q.  All right.  And then at that point, what?  You
22   would have then e-mailed them your outline and your
23   general expectations?
24        A.  No.
25        Q.  You just told them?
```

**75**

```
 1        A.  In fact, I think what happened was that they
 2   offered to help.
 3        Q.  Okay.  So how would they offer to help?  You
 4   just then went and complained to them about what just
 5   went down with Ms. Pina?
 6        A.  No.  I think they probably saw me getting ready
 7   to do the -- in fact, I'm thinking about it.  I'm
 8   remembering it now.  So I think they saw me getting ready
 9   to do the meeting and they offered to help.
10        Q.  So they saw you --
11        A.  They knew that I wasn't the one who was supposed
12   to do that meeting.
13        Q.  So they saw you -- let me make sure I get where
14   this is occurring.  Where did this conversation with
15   Ms. Pina occur?
16        A.  At the registration table in front of the
17   meeting.
18        Q.  Okay.  And so then Ms. Nottage and -- I'm sorry,
19   what was his name again?
20        A.  Warren.
21        Q.  Warren.  Ms. Nottage and Mr. Hoover would have
22   just seen you and then they came over to see if you
23   needed assistance?
24        A.  I don't really know exactly how that happened.
25   I think what they saw was me in the room setting up.  And
```

**76**

```
 1   then I mentioned to them that Sage no longer was going to
 2   do the presentation.  And at that point I think they
 3   offered to help.
 4        Q.  Okay.  So your conversation with Ms. Pina took
 5   place at the registration table; is that right?
 6        A.  Correct.
 7        Q.  Then you would have gone into the room where the
 8   presentation was going to take place; is that right?
 9        A.  Correct.
10        Q.  So what, you had your laptop on you?
11        A.  Yes.
12        Q.  So you were starting to create a new
13   presentation or --
14        A.  Yes.
15        Q.  -- you were working off of the presentation that
16   Ms. Pina gave you?
17        A.  No.  I was actually looking for an older
18   presentation that I had from another industry and I was
19   going to use that.
20        Q.  Okay.  What industry?
21        A.  Kirby Company, when I worked for the Kirby
22   Company.
23        Q.  All right.  So you took a presentation -- you
24   were searching for a presentation that you had done or
25   had seen previously from your time with Kirby; is that
```

Case 4:21-cv-00772-WBG   Document 36-3   Filed 11/02/22   Page 14 of 17
19 (Pages 73 to 76)
CRAWFORD REPORTING -- CrawfordReporting@gmail.com

**77**

1 right?
2    **A. Yes.**
3    Q. At that point, Ms. Nottage and Mr. Hoover had
4 wandered into the room and they saw you?
5    **A. Yes.**
6    Q. At that point they said, hey, can we help you?
7    **A. Yes.**
8    Q. Okay. So they asked if they could help you and
9 then you indicated yes; is that right?
10    **A. That's correct.**
11    Q. All right. So at that point, did they have
12 their laptop on them?
13    **A. I believe so, yes. Because they used their**
14 **laptop, so yes, they did.**
15    Q. Okay. And so they had their laptop on them.
16 And then you indicated that you would then like for
17 them -- or rather they indicated that they would assist
18 you?
19    **A. They indicated that they could do it.**
20    Q. And so then they put a presentation together; is
21 that right?
22    **A. Yes.**
23    Q. And then they were the ones that presented the
24 presentation to the franchisees, right?
25    **A. Yes.**

**78**

1    Q. Did they provide that presentation to you --
2    **A. No.**
3    Q. -- before the meeting? What's that?
4    **A. No. I probably just scanned it.**
5    Q. Okay. You didn't receive that by e-mail or any
6 other type of --
7    **A. No. They didn't e-mail it to me, so that's why**
8 **I don't know for sure if I have it or not.**
9    Q. Okay. So you don't know necessarily whether or
10 not you have that in electronic form, correct?
11    **A. That's correct.**
12    Q. And then Ms. Nottage and Ms. Hoover then
13 performed the presentation, correct?
14    **A. It's Mr. Hoover.**
15    Q. Mr. Hoover. They then performed the
16 presentation, correct?
17    **A. That's correct.**
18    Q. When did the conference end?
19    **A. The conference ended Thursday night, February**
20 **13th.**
21    Q. Did you have any further communications with
22 Ms. Pina after that?
23    **A. No.**
24    Q. Did you see her after that?
25    **A. After the conference?**

**79**

1    Q. After your conversation with her at the
2 registration booth.
3    **A. Yes, I did see her.**
4    Q. Did you have any communication with her?
5    **A. I did not.**
6    Q. Okay. And then at some point you made the
7 decision to terminate Ms. Pina from my understanding,
8 correct?
9    **A. Yes.**
10    Q. Earlier you indicated you spoke to Mr. Sanders;
11 is that right?
12    **A. I did.**
13    Q. And I believe you indicated that you simply
14 indicated to him that you were going to make the decision
15 to terminate her; is that right?
16    **A. That's correct.**
17    Q. Similarly, you simply indicated to Mr. Mancillas
18 that you were going to terminate her; is that right?
19    **A. Luke wasn't there.**
20    Q. When you returned to Kansas City?
21    **A. Yeah.**
22    Q. Did Mr. Mancillas ever indicate to you that
23 employees have requested a meeting with Mr. Sanders
24 regarding complaints of discrimination or harassment
25 against you?

**80**

1    MR. PORTO: I object to form. It's been
2 asked and answered. Go ahead and answer if you know.
3    **A. No.**
4    Q. (BY MR. STALLWORTH) Are you aware of whether or
5 not employees ever had a meeting with Mr. Sanders as it
6 results to complaints of discrimination or harassment?
7    **A. I am not aware.**
8    Q. Are you aware of whether or not employees ever
9 had a meeting with Mr. Sanders as it results -- as it
10 relates to complaints of discrimination, harassment or
11 retaliation by you?
12    **A. I am not aware.**
13    MR. STALLWORTH: I have no further
14 questions.
15    MR. PORTO: I am going to print off a
16 couple of those exhibits so I can ask Mr. Sayler a few
17 questions about them.
18    (Off the record from 10:54 until 11:07
19 a.m.)
20 EXAMINATION BY MR. PORTO:
21    Q. Mr. Sayler, just a few quick questions for you.
22 The date you arrived in Las Vegas was when? The date you
23 arrived in Las Vegas for the February 2020 conference was
24 when?
25    **A. February 10th, Monday, I believe.**

101

```
 1      Q.  All right.  And you already indicated to me
 2  earlier that you never even attended the social media
 3  presentation; isn't that right?
 4      A.  The one during the event?
 5      Q.  Was there another one?
 6      A.  No, there were two -- it was set up to where
 7  there were breakouts.
 8      Q.  Okay.
 9      A.  There would be like in hour shots, so different
10  people could attend different breakouts at different
11  times.
12      Q.  So we have been referencing the social media
13  presentation today.  So was there more than one social
14  media presentation?
15      A.  Yeah.
16      Q.  Okay.  And so was Ms. Pina supposed to present
17  at multiple social media presentations?
18      A.  Yes.
19      Q.  So was this the first social media presentation
20  of the conference?
21      A.  Of the day, yes.
22      Q.  Okay.  And you didn't attend that one, correct?
23      A.  I didn't attend the whole thing.  I probably
24  walked in, poked my head in, and saw how it was going and
25  left.  There are other ones going on at the same time.
```

102

```
 1      Q.  Okay.  Earlier when I asked you if you attended
 2  the social media presentation you said no.
 3      A.  In the context of what you're asking, did I
 4  attend it from start to finish?  No.  Did I poke my head
 5  in there to see what was going on?
 6      Q.  Okay.  When you poked your head in to see what
 7  was going on, what were they talking about?
 8      A.  Social media.
 9      Q.  Like what?
10      A.  Digital marketing.  I think at that particular
11  time they were covering Facebook when I poked my head in.
12      Q.  Who was that?  That would have been Ms. Nottage?
13      A.  Angel Nottage and Warren Hoover.
14      Q.  Okay.  And it's your testimony that you have
15  that presentation; is that right?
16      A.  No, it's not my testimony.  I don't know if I
17  have it or not.
18      Q.  Okay.  So you have no way to let us know what
19  necessarily Ms. Nottage or Mr. Hoover were presenting on
20  at the time that you poked your head into the
21  presentation; is that right?
22      A.  Other than what I saw was Facebook on the
23  screen.
24      Q.  Okay.  That is not my question though.  You
25  don't have any way right now to let us know what
```

103

```
 1  Ms. Nottage or Mr. Hoover were speaking on when you poked
 2  your head into the presentation; is that correct?
 3      A.  That's correct.
 4      Q.  All right.  So you have indicated that of course
 5  that this was important because you were encouraging
 6  individuals that may want to purchase a franchise,
 7  correct?
 8      A.  No.
 9      Q.  No?
10      A.  There were people that potentially would
11  purchase a franchise, but there were also signed
12  franchisees, legitimate franchisees.  In fact, most of
13  them that were there were franchisees, existing
14  franchisees.
15      Q.  There were dual -- there were several bases for
16  why the event was important, correct?
17      A.  Yes.
18      Q.  All right.  Did you do a survey of attendees at
19  the conclusion of the social media presentation?
20      A.  I don't recall.
21      Q.  You didn't go out and poll the individuals about
22  what they thought was helpful about the presentation or
23  what they didn't think was helpful about the
24  presentation, did you?
25      A.  I do recall that we did send a survey out about
```

104

```
 1  the conference overall.
 2      Q.  Okay.  That wasn't my question though.  I asked,
 3  did you do a survey about the social media presentation?
 4      A.  No.  Not that I'm aware.
 5      Q.  You didn't do one personally, right?
 6      A.  No.
 7      Q.  You didn't go and ask any of the attendees
 8  whether or not they felt that the presentation that
 9  Ms. Nottage and Mr. Hoover put together in 45 minutes was
10  actually effective, did you?
11      A.  I believe that when we sent out the survey about
12  the conference that we did ask questions about the
13  breakouts.
14      Q.  Okay.  So my question was, did you or did anyone
15  else go and speak to employees -- speak to the attendees
16  immediately after the social media presentation or
17  presentations whether or not they felt that it was
18  effective?
19      A.  I probably did.  I don't recall, but that's
20  normal.
21      Q.  Did you write it down?
22      A.  I would say, "How did that go?"
23      Q.  Did you write it down?
24      A.  No.
25      Q.  You don't have any notes from what any of the
```

1 attendees may have indicated with respect to whether or
2 not they thought the social media presentations were
3 effective, correct?
4     **A.  I did not write anything down.**
5     Q.  All right.  And then you indicated that there
6 may have been some type of survey that was sent out after
7 the fact; is that right?
8     **A.  Correct.**
9     Q.  And this would have gone out to the 250
10 attendees?
11     **A.  Correct.**
12     Q.  Was there -- were there any responses from the
13 attendees?
14     **A.  I believe so, but I don't -- it's foggy.  It's a**
15 **long time ago.**
16     Q.  In that survey, did it just say, what did you
17 think of the conference as a whole or did it break it
18 down by what the presentations were?
19     **A.  I don't recall the details of the questions that**
20 **were asked in the survey.**
21     Q.  Okay.  So you don't have any idea whether or not
22 it specifically asked about the social media
23 presentation, do you?
24     **A.  At this point, no.**
25     Q.  Okay.  You could find that out for us, correct?

1     **A.  Possibly yes, possibly no.  I can try.**
2     Q.  As we sit here today, you have no idea whether
3 or not there is any written documentation regarding
4 whether the attendees to the social media presentation
5 felt that it was effective or not; is that right?
6     **A.  Correct.**
7     Q.  I am going to pull up -- have you ever seen this
8 document before, sir?
9     **A.  I don't think so.**
10     Q.  All right.  This has been marked as Plaintiff's
11 Exhibit No. 3.  It says, "Internal Communications
12 Planning."
13         Do you see that?
14     **A.  Internal communications, yeah, I see that part.**
15     Q.  And on the top right there's an American Shaman
16 Franchise Systems' logo to the right, correct?
17     **A.  Yes.**
18     Q.  And then it talks about, "Where are we now?"
19         Do you see that?
20     **A.  Uh-huh.**
21     Q.  And then it has a number of bullet points,
22 right?
23     **A.  Yeah.**
24     Q.  Okay.  And on the fourth bullet point it talks
25 about low morale.  Do you see that?

1     **A.  Yes.**
2     Q.  It says, "Employees don't feel valued and
3 express that the lack of transparency is affecting their
4 personal growth and development opportunities."
5         Do you see that?
6     **A.  Uh-huh.**
7     Q.  Is that a "yes," sir?
8     **A.  Yes.  Sorry.**
9     Q.  Then this says, "And worse, they are losing
10 trust with the company and often openly and verbally
11 express concerns."
12         Do you see that?
13     **A.  Yes.**
14     Q.  Is that a concern for you if employees felt that
15 they didn't have trust with the company and that they
16 were openly and verbally expressing concerns?
17         MR. PORTO:  I object to the form of the
18 question.  Assumes fact not in evidence and lacks
19 foundation.
20     Q.  (BY MR. STALLWORTH)  You can answer.
21     **A.  It would be concerning to me.**
22     Q.  That would be a concern for you, right?
23     **A.  Yes.**
24     Q.  And then it talks about the fact that this could
25 be an issue as the company attempts to bring new people

1 onto the team.  Do you see that?
2     **A.  Yes.**
3     Q.  And then it says, "Where we want to be."
4         Right?
5     **A.  I see that.**
6     Q.  And it talks about, "Well informed and highly
7 engaged employees."
8         Do you see that?
9     **A.  Yes.**
10     Q.  And that is important, right, because the
11 company would like to have informed and engaged
12 employees, correct?
13     **A.  Yes.**
14     Q.  All right.  It talks about the fact that there
15 should be, "Consistent cross-departmental communication
16 and collaboration."
17         Correct?
18     **A.  Correct.**
19     Q.  It talks about the fact that there should be --
20 or rather it should, "Encourage and provide avenues for
21 feedback for employees and franchisees."
22         Correct?
23     **A.  Correct.**
24     Q.  And it says, "Inspiring, not just informing."
25         Right?

Case 4:21-cv-00772-WBG   Document 36-3   Filed 11/02/22   Page 17 of 17
27 (Pages 105 to 108)
CRAWFORD REPORTING -- CrawfordReporting@gmail.com